## DAVIS v. PHILADELPHIA & R. RY. CO.

(District Court, M. D. Pennsylvania. March Term, 1921.)

### No. 1244.

1. Master and servant ⟻137(4)—Trackwalker's injury by train held not actionable.

   A railroad company *held* not liable for the death of a trackwalker struck and killed by a train from behind, though he could have been seen from the engine after reaching a point 2,200 feet from the place of the accident, and no warning signal was given; it appearing that the train was operated in the usual manner, and there being no evidence that he was actually seen by those on the engine.

2. Master and servant ⟻204(1)—Assumption of risk defense under federal act.

   A trackwalker assumes the risk of injury by trains operated in the usual and customary manner, and this rule is not changed by federal Employers' Liability Act (Comp. St. §§ 8657–8665).

At Law. Action by Mary A. Davis, administratrix of the estate of Earl F. Davis, deceased, against the Philadelphia & Reading Railway Company. On motion to take off nonsuit. Denied.

John R. Geyer, of Harrisburg, Pa., for plaintiff.
John T. Brady, of Harrisburg, Pa., for defendant.

WITMER, District Judge. This action was brought by the administratrix of a deceased employee of the Philadelphia & Reading Railway Company under the federal Employers' Liability Act (Comp. St. §§ 8657–8665), averring that the defendant was engaged in interstate commerce, and that plaintiff's deceased, Earl F. Davis, was employed by it, and was also engaged in that business at the time of the injuries received, which resulted in his death. Defendant is charged with the want of exercising due care on the part of its employees in charge of

the train that killed Davis in this particular, that the train on the occasion was run at a high rate of speed without keeping proper lookout on its track ahead of it, and without giving any notice or warning of any kind of its approach, although Davis was within plain view of the operator in charge of such train.

[1] Davis was a trackwalker on the main line of the defendant company, connecting Harrisburg and Reading, Pa., and as such was on the day of the accident at work near Hershey Station in Dauphin county, more particularly described as a short distance east of Derry Church grade crossing. At this point the main line consists of three tracks; two east-bound and one west-bound. Upon the outer of the east-bound tracks (No. 4) slow trains are moving; the other track (No. 2) being used for fast or passenger train travel. In the course of his employment, Davis discovered that a certain plate connected with a rail in the east-bound track required repair, and was returning from the toolhouse with the necessary tools to make such repair. After leaving the toolhouse, located to the south of the track at the crossing, he traveled diagonally across track 4, going east upon such, and then proceeded in the same direction on track 2. While proceeding eastwardly, a freight train came from the west on the east-bound No. 4 track, and, while this train was on the crossing, an engine and caboose running at about 35 miles an hour overtook and struck him on the middle east-bound track about 585 feet from the crossing, killing him almost instantly.

It was shown that from the direction the train was moving to the point where he was struck there was a straight stretch of track to at least a distance of 2,200 feet, for which distance he was in plain view of those in charge of the train, and could have been seen had they looked ahead and observed. In the failure to do so, and to give proper notice or warning, lies the negligence imputed to the defendant.

The only witness to the occurrence was the crossing watchman, who says that while he (witness) was at the watch box located at the crossing on the south side of the track, Davis came and got a bar, wrench, angle plate, and hammer, and started out, going east, cutting cattycornered on No. 4 track across to No. 2, walking ordinary gait down this track about 195 steps, or 585 feet, from the crossing to where he was struck. Witness says he was at the watch box controlling the crossing. Being asked:

"Q. What was the next you saw or heard? A. The next I saw—I seen a train coming down on track 4, and got out on the crossing to keep anybody from crossing.

"Q. That was not the train that struck him? A. No, sir.

"Q. And then what did you see? A. After that the fellow was over the crossing while 1700 came around the corner.

"Q. You mean after the train had gone over the crossing? A. Yes, sir.

"Q. You mean the train? A. About the center of the train when I saw him.

"Q. Then you saw 1700 coming around the corner? A. Yes.

"Q. Near the corner at the west? A. Yes.

"Q. What was 1700—a full train? A. No, sir; just engine and caboose.

"Q. And at what rate of speed was he coming? A. Probably 35 miles an hour.

"Q. On what track? A. No. 2.

"Q. And going in what direction? A. East.

"Q. What did he do? A. Didn't do nothing. Didn't make any kind of sign as I heard of.

"Q. No whistle or bell? A. Not that I heard.

"Q. And you were watching the crossing? A. Yes.

"Q. And then what did you do when he passed you that way? A. I signaled the fireman to whistle. I pointed ahead that there was a man walking.

"Q. He could not see the man ahead walking? A. Yes.

"Q. Which side of the engine was the fireman? A. Left side.

"Q. On your side? A. Yes.

"Q. What did the engineer do when you motioned him and called for him to whistle that there was a man on the track? A. You mean to say the fireman. He went for the automatic brake to stop it.

"Q. What did you see next? A. I seen him—that is all. I seen a man flying out on the side of the track."

The witness was quite deaf and on cross-examination regarding whether the engineer gave the accustomed crossing signal, he replied, on being interrogated:

"Do you remember shortly after the accident, when he called to see you to get a report about this accident, that you then said you could not tell whether the engine whistled or not? A. That is what I said; yes, sir.

"Q. You do not know whether it whistled or not? A. No, sir.

"Q. (by Mr. Geyer). Did you hear it whistle? ' A. No, I did not hear it.

"Q. Did you hear any bell, or warning of any kind? A. No, sir."

The witness testified that he was on the north side of the track, and the engine that struck Davis was on track 2 between the train on track 4 and the witness. He admitted that there was considerable noise from the movement of the train on track 4, and more from the engine and caboose on track 2.

[2] The question presented by this motion to take off the compulsory nonsuit entered on closing plaintiff's case is whether the evidence offered warranted submission of the case to the jury. The evidence is clear, and plainly discloses that there was nothing unusual in the operation of the train that injured Davis. There was no violation of a statutory requirement, nor was there failure of compliance with any orders or recognized custom or rule adopted for the safety and protection of employees. Thus, in the absence of evidence showing that those in charge of the engine were aware of Davis' presence on the track where he was injured, or, having discovered him, recklessly ran him down, they should not be held guilty of negligence. To hold the contrary would indeed unreasonably burden those charged with the grave and responsible duty of operating the instruments of conveyance by rail. It would remove the entire responsibility of caring for the safety of those employed upon the track, and place it upon the shoulders of those having to do with the operation of the engine and train, involving attention to signals of every degree of importance, and entirely relieve those who have nothing but their own safety at stake. Nor could it be held that, notwithstanding, the risk was assumed, since in order to constitute negligence such conduct must be regarded as unusual, and consequently not assumed, though it has been held that a railroad trackwalker employed to walk over, watch, and repair tracks where there is a constant passing of trains necessarily assumes the risk of being struck by trains properly or ordinarily operated. Connelley v.

Pennsylvania R. Co., 228 Fed. 322, 142 C. C. A. 614. In delivering the opinion, Circuit Judge Buffington said:

"It is an obvious fact that many occupations, as, for example, a powder mill operator, a structural iron worker, a diver, a blaster, a trackwalker, necessarily subject those who follow them to great dangers. When therefore a man contracts for such employment, he knows and takes on himself the risks and dangers incident to such dangerous work. His assumption of those obvious and unavoidable risks is in the very nature of things part of his employment. It follows therefore that the employer violates no legal duty to his employee in failing to protect him from dangers which cannot be escaped by any one doing such work. Narramore v. Cleveland, C., C. & St. L. Ry. Co., 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 68.

"It is obvious that, even where a railroad operates its trains and moves its switch drafts in a proper and careful manner, trackwalkers and repairmen are necessarily subjected to great risks. Their very occupation is one of constant peril. Indeed, it follows from the nature of such employment that the duty of self-preservation has to rest on them, for no adequate protection, other than self-protection, can be afforded them. And such has been the reasonable holding of the law. Thus in Norfolk & W. Ry. Co. v. Gesswine, 144 Fed. 56, 75 C. C. A. 214, it was said: 'This man was one of a number of men who were employed as section men on the railroad. They were engaged in repairing the track, taking out rails, putting in new ones, taking out crossties and putting in new ones, and hewing them into proper form and shape, and were working on the railroad track, while the trains were being operated in the usual way; manifestly, a place of danger. A railroad does not suspend the operations of its trains until the track can be put in order, and the proposition to these sectionmen was, "We will run the trains and operate the road as heretofore, as we ordinarily do, and between trains you must do this work and look out for yourselves to avoid being injured by the trains," and the sectionmen accept the employment upon these terms, and if an accident occurs, and they are hurt while the trains are being managed and operated in the usual and ordinary way, they can have no just ground of complaint against the railroad. It is not the fault of the railway company.'

"So, also, in Aerkfetz v. Humphreys, 145 U. S. 418 (12 Sup. Ct. 835, 36 L. Ed. 758), where an experienced trackman was injured by a moving train in a switching yard, it was said: 'Under such circumstances, what negligence can be attributed to the parties in control of the train, or the management of the yard? They could not have moved the train at any slower rate of speed. They were not bound to assume that any employee familiar with the manner of doing business would be wholly indifferent to the going and coming of the cars. There were no strangers whose presence was to be guarded against. The ringing of bells and sounding of whistles on trains going and coming and switch engines moving forward and backward would have simply tended to confusion. * * * It cannot be that, under these circumstances, the defendants were compelled to send some man in front of the cars for the mere sake of giving notice to employees who had all the time knowledge of what was to be expected. We see in the facts as disclosed no negligence on the part of the defendant.'

"Indeed, in thus making self-protection the substantial safeguard of trackwalkers and section men, the law is reasonable and just, for no other dependable safeguard can be afforded their perilous work in the practical operations of railroads. As said in Keefe v. Railway Co., 92 Iowa, 182 (60 N. W. 503, 54 Am. St. Rep. 542), 'These rules are founded upon the necessities of the business of operating railways,' and in Rosney v. Erie R. Co., 135 Fed. 311 (68 C. C. A. 155): 'An elaborate system of signals by ringing bells, sounding whistles, swinging lanterns, and waving flags, designed to cover the erratic movements of switching engines and extra freight trains, would quite likely have tended to complicate and confuse the situation.' This rule has the uniform support of courts in all sections of the country. Morris v. Boston & M. R. R., 184 Mass. 368, 68 N. E. 680; Bancroft v. Boston & M. R. R., 67 N. H. 466, 30 Atl. 409; Railroad Company v. Hester, 64 Tex. 401; Carlson v. Cincin-

natl, S. & M. R. Co., 120 Mich. 481, 79 N. W. 688; Pennsylvania R. Co. v. Wachter, 60 Md. 395."

In Curtis, Adm'r, v. Erie R. R. Co., 267 Pa. 227, 109 Atl. 871, where the decedent was employed to repair tracks and remove snow and ice from the yard of the defendant company, and while carrying it across the tracks, was struck by a switching engine operated in the usual way, moving backwards without warning, running 2 or 3 miles an hour, recognizing the doctrine of assumption of risk as modified by the federal Employers' Liability Act, and defined in Seaboard Air Line R. R. v. Horton, 233 U. S. 498, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475, and Boldt, Adm'x, v. Penn. R. R., 245 U. S. 441, 38 Sup. Ct. 139, 62 L. Ed. 385, the court held that since the evidence was insufficient to establish a custom to provide protection by furnishing a lookout for trains using the tracks of the switching yard, and there was no proof of any rule or custom requiring those in charge of the engine engaged in switching cars to ring a bell or sound a whistle, it was not negligence on the part of the company to afford such protection or to neglect giving such warning; and that the danger of being injured by the engine in the absence of these precautions was a risk assumed by a yard workman as incident to the employment.

It is true that some distinction has been recognized in favor of accidents occurring on main line tracks. For instance, in Van Zandt v. P., B. & W. R. R., 248 Pa. 276, 93 Atl. 1010, Glunt v. Penna. R. R., 249 Pa. 522, 95 Atl. 109, and McGovern v. P. & R. Ry., 235 U. S. 389, 35 Sup. Ct. 127, 59 L. Ed. 283, the accident occurred while the injured person was engaged in work on main line tracks. The same distinction appears in Seaboard Air Line R. R. v. Koennecke, 239 U. S. 352, 355, 36 Sup. Ct. 126, 127 (60 L. Ed. 324), where decedent was killed by a train in the act of entering the yard from the main line track, the basis of which decision appearing from the following quotation:

"The jury might have found that the case was not that of an injury done by switching engine known to be engaged upon its ordinary business in a yard, like Aerkfetz v. Humphreys, 145 U. S. 418, but one where the rules of the company and reasonable care required a lookout to be kept."

On examination of the cases where recovery was allowed for accidents occurring on main line tracks, it will be observed that failure to observe a known rule or order of the company, coupled with want of reasonable care, is assigned as a foundation upon which such recovery is rested. In the cases depended on by defendant's counsel, the distinction from the case in hand may be noted as bearing on the conclusion reached.

In Glunt v. Penna. R. R. Co., supra, the plaintiff had been informed by his foreman that the middle track, known as track No. 2, would be used on the day in question for east-bound trains only. Without notice to the contrary or warning a train running west-bound on this track struck the plaintiff.

In Van Zandt v. P., B. & W. R. R. Co., 248 Pa. 276, 93 Atl. 1010, supra, the injured plaintiff was the employee of an independent contractor doing work on a bridge covering a period of five or six months prior to the accident. His presence on the bridge was known to the

company and its employees, and the court held that he was entitled to warning.

In McGovern v. P. & R. Ry., supra, the foreman in charge warned the men off track No. 4 in order to let a local train pass. McGovern, with others, was working on track No. 2. There was no call to them, and they continued working and were struck by a train coming in the opposite direction. The customary notice of the foreman to the section men was the negligence assigned. Counsel is prepared to concede that under the common-law doctrine the negligence in this case was the negligence of a fellow servant, of rank less than a vice principal, for which no recovery could be had, but he insists that this defense was taken away by the federal Employers' Liability Act. His contention is to the effect that the ordinary negligence of a fellow servant is a risk not assumed by his coemployee under the provisions of the act, stoutly insisting that the language in the syllabus of Dutrey v. P. & R. Ry. Co., 265 Pa. 215, 108 Atl. 620, that "the servant assumes the risks incident to the negligent acts of the officers, agents and fellow employees of the master, but he does not assume the risks of unusual and extraordinary acts of negligence," does not correctly express the established rule.

Without following the ingenious argument of counsel, it is enough to note the conclusion of Mr. Justice McReynolds, expressed in Boldt v. Penna. R. R. Co., 245 U. S. 441, supra, on page 446, 38 Sup. Ct. 139, 140 (62 L. Ed. 385), saying:

"The risk held to have been assumed in the Horton Case certainly arose from negligence of some officer, agent or employee; and if the negligence of all these should be excluded in actions under the Employers' Liability Act it is difficult to see what practical application could ever be given in them to the established doctrine concerning assumption of risk."

Applying, then, the principles recognized, the opinion is expressed that the incidents assigned as the negligent acts of the defendant were not unusual and assumed by the employee in his unfortunate situation where death overtook him.

The motion is denied, and new trial is refused.