[No. 22261. Department Two. September 8, 1930.]

CELIA CROSS, as *Administratrix, Respondent,* v. SPOKANE, PORTLAND & SEATTLE RAILWAY COMPANY, *Appellant.*[1]

---

[1]Reported in 291 Pac. 336.

*Cannon, McKevitt & Fraser* and *Carey & Kerr,* for appellant.

*Don F. Kizer* and *Joseph J. Lavin,* for respondent.

FULLERTON, J.—This action was brought by the respondent, Celia Cross, as administratrix of the estate of her deceased husband, Frank W. Cross, against the appellant, Spokane, Portland & Seattle Railway Company, to recover in damages for the death of her husband, which she alleges was caused by the negligent acts of the appellant. There was a trial by jury in which a verdict was returned in favor of the respondent for the sum of $8,000. A judgment was entered on the verdict, and from the judgment the railway company prosecutes this appeal.

In the main, the facts are not in dispute. The appellant is a common carrier engaged in operating a railroad between the city of Portland, in the state of

Oregon, and the city of Spokane, in the state of Washington. Its business is interstate, and it is subject to the rules applicable to common carriers of interstate commerce. Its roadbed, as it nears the city of Spokane, extends through a series of rock cuts. The width of the cuts is some twenty-eight feet, and the railroad track is laid in the center of the cuts, elevated somewhat from the bottom. The course of the road through the cuts is tortuous. The walls of the cuts are somewhat perpendicular, and average twenty or more feet in height, preventing the operators of trains through them from having a vision of the roadbed in certain places for any considerable distance in front of the train.

The respondent's husband was, at the time of his death, an employee of the appellant railway company. He was employed as a track inspector, and his duties required him to patrol a part of the appellant's road some two and a quarter miles in length, a part of the way extending through certain of the rock cuts before mentioned. His hours of work were from seven o'clock in the evening until six o'clock in the morning, and he seems to have been expected to pass over the track at least once after the passage of every train. He had been employed by the appellant for a period of some three years. His duties were at first that of a section-hand, and he was promoted to that of track inspector because of his prudence and reliability. He was killed at about 5:30 o'clock in the morning, while on the way to the terminal point of his beat at which his labors ceased.

At the time of his death, Cross was riding a vehicle sometimes called in the record a speeder and sometimes a velocipede. It was a three-wheeled vehicle, operated by foot and hand power. It was run over the railway tracks, and was so constructed as to en-

able its operator to remove it from the tracks almost instantly. He was run down by a freight train traveling over the track in the same direction in which he was traveling. The accident occurred in a cut where there was such a curvature as to prevent the operators of the train from seeing him until the train was almost upon him. The testimony as to the subsequent happenings is that of the engineer and fireman of the train. Their testimony is that, as soon as the deceased came within their vision, an alarm whistle was sounded, and an effort made to stop the train by throwing off the power of the engine and "dynamiting" the train; the quoted term being explained to mean in railroad parlance as using the means provided for making emergency stops. Their testimony also tends to show that the deceased became confused when he discovered his situation; that, when the whistle was sounded, he looked back and continued for a time on his course, making no effort either to throw the speeder or himself from the track until the train was almost directly upon him.

The work in which the deceased was engaged is regarded by railroad men as being hazardous in all situations, and extremely so in cuts where there is a curvature in the track. For this reason, track inspectors are rarely permitted to use speeders on any part of the track while in the performance of their work, and never so in a place, of which the place here described is typical, where the use of a speeder would unduly increase the hazard. The possession of the speeder by the deceased at the time he was killed is explained by the fact that he lived some five miles east of the easterly terminal point of his place of work, and asked and obtained leave to use the speeder in riding to and from his place of work and his home. At the time he was granted this permission, his atten-

tion was called to the extremely hazardous place in which he was working, to the rule of the company forbidding the use of speeders in such places, and he was directed not to use it while in the performance of his work.

At the entrance of a cut immediately preceding the cut in which the deceased was killed, was a signal post with a signboard containing the word "Slow." This was explained to mean that trains operated over the road must be limited in speed by their operators to that prescribed from time to time by instructions from the operating department of the road. The instructions in force at the time of the accident, and at the place of the accident, limited the speed of passenger trains through the cuts to forty miles per hour, and the speed of freight trains to twenty-five miles per hour. There was also, at a place several hundred feet back of the entrance to the cut in which the accident occurred, a signal post requiring the engineer of a train to sound the engine whistle when reaching it. There is also a general rule of the company requiring the whistle to be sounded at all "obscure places."

There is both direct and circumstantial evidence that the deceased fully understood the hazardous nature of his work. He was informed of it by his immediate superior at the time of his employment as a track inspector; he had been working in that vicinity as a section-hand for a year and a half prior to the time of such employment; and was familiar with the situation. And especially did he know the dangers of using a speeder through the cuts. Between his home and the beginning point of his place of work, the track was, for the greater part, in the open.

There was, however, a considerable cut at a place in the road which he must pass through just prior to reaching his place of work, and there was a telegraph

station at a place he must pass before reaching the cut. It was his habit to stop and inquire of the operator of the station whether there were any trains in its immediate vicinity. The operator's testimony on this point is that he never inquired for the line-up of trains generally; that he simply wanted to know whether there was a train coming which he was likely to meet in passing through the cut between the station and his place of work; saying that he never took the speeder beyond that point.

The evidence relating to the circumstances occurring immediately prior to the time Cross met his death is conflicting, but we must accept that version of it as true which tends to support the verdict of the jury. The train which ran over and killed Cross, as we have said, was a freight train, and its speed was limited at the place of the accident to twenty-five miles an hour. The evidence was that its speed at the place was between "30 and 40 miles per hour." There was evidence that the whistle of the engine was not sounded as it passed the whistling signal immediately prior to the entrance of the train into the cut in which the accident occurred, and evidence that it was not sounded at the entrance of the cut, which would seem to fall within the definition of an obscure place. There was evidence also that Cross frequently rode the speeder over that part of the track on which he was killed. Whether his immediate superiors had knowledge of the fact, is not so clear. They deny having such knowledge, and evidence to refute their testimony is the inference arising from the testimony that Cross was frequently seen using the speeder while in the performance of his work.

The evidence is clear that track inspectors are instructed and expected to depend upon their own vigilance and care for their own safety. The company has

such inspectors on every part of its road. The inspectors can have no regular times for passing over their respective beats, and the company is for that reason powerless to protect them. The most it can do is to direct that passing trains signal at appropriate places, and it has a general rule to this effect.

The action of the respondent was begun and prosecuted under the Federal Employers' Liability Act (35 Stat. at Large 65). The terms of the act are so well understood as to require no more than a mere outline of them here. By the first section of the act, it is provided that every common carrier by railroad, while engaged in interstate commerce, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his personal representatives, for any injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carriers. By the third section of the act, contributory negligence on the part of the employee is not a bar to such an action, but the damages shall be diminished by the trier of the facts in proportion to the amount of negligence attributable to such employee. By the fourth section, it is provided that, in all such actions, the employee shall not be held to have assumed the risk of his employment in any case where the violation by the common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee. This has been construed by the authoritative court not to abolish the doctrine of assumption of risk in instances where the doctrine is applicable under the general rules of law.

The appellant concedes, or at least does not question, that the action of the respondent was properly instituted under the provisions of the above cited act.

Nor does it contend that negligence of the deceased Cross contributing to his death would bar a recovery on the part of the respondent. On this branch of the case, it concedes that contributory negligence on his part is a matter to be considered by the jury only in fixing the amount of the recovery. At appropriate times, however, during the course of the trial, it challenged the sufficiency of the evidence to sustain a verdict and judgment against it, basing its challenges on the ground that Cross, by entering into the employment, assumed the risk of injury arising therefrom; and its principal and main contention is that the trial court erred in not sustaining some one of these challenges and entering a judgment in its favor on the law of the case.

It is undoubtedly the general rule that an employee assumes the usual and ordinary risks of his employment. It is equally the general rule that the risk assumed is not measured by the degree of the risk. Even in the operation of railroads, there are certain employments that are attended with little or no risks, while in others the risks attending the employment are extremely hazardous. But, be the risks small or great, if they are risks attendant upon or inherent in the employment, they are but the usual and ordinary risks of the employment, and are risks assumed by the employee.

So that here, did nothing more appear to cause the death of Cross than the dangers incident to his employment, there could be no recovery founded on the fact that he was killed while in the course of the employment. But there is here an added element. It was shown by evidence, which the triers of the fact were entitled to believe, that the train which ran down and killed him was operated in violation of the rules of the appellant—that it was being run in excess of

the prescribed speed limit, and that no whistle was sounded either at the whistling post placed just preceding the point of entry into the rock cut in which Cross was killed, or at the time of the entry of the train therein—and the question is whether this omission of duty was but a part of the usual and ordinary risk assumed by him, or did it create an unusual or extraordinary risk which he did not assume.

That the excessive speed of the train and the failure to sound the alarm added to the hazard of the employee, is hardly to be doubted. Being compelled to rely wholly on his senses of sight and hearing for his protection, it was of vital importance to him that the operators of trains over the road obeyed the rules as to speeds and signals. The difference between a train going twenty-five miles an hour and one going between thirty and forty miles an hour, when discovered by him, could easily mean the difference between life and death, and, clearly, the sounding of the alarm signals by an approaching train was even of more importance to him. It is hard, therefore, to conceive that negligence in these respects was negligence which he assumed by his contract of employment.

The question is, of course, controlled. by the decisions of the Federal courts, and it is said that those courts have announced a different rule. But we do not so understand the cases. The case of *Chesapeake & Ohio R. Co. v. Proffitt,* 241 U. S. 462, was an action brought under the Federal employers' liability act. The plaintiff was a brakeman on the defendant's road, and was injured by the negligent act of a fellow-servant. He recovered a verdict for substantial damages in the trial court, and the judgment entered thereon was affirmed in the circuit court of appeals, 218 Fed. 23. On a writ of error to the supreme court, the judgment was also affirmed, the court using this language:

"To subject an employee, without warning, to unusual dangers not normally incident to the employment, is itself an act of negligence. And, as has been laid down in repeated decisions of this court, while an employee assumes the risks and dangers ordinarily incident to the employment in which he voluntarily engages, so far as these are not attributable to the negligence of the employer or of those for whose conduct the employer is responsible, the employee has a right to assume that the employer has exercised proper care with respect to providing a reasonably safe place of work (and this includes care in establishing a reasonably safe system or method of work) and is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known of it. The employee is not obliged to exercise care to discover dangers not ordinarily incident to the employment, but which result from the employer's negligence. *Tex. & Pac. Ry. v. Archibald,* 170 U. S. 665, 671, 672; *Choctaw, Oklahoma &c R. R. v. McDade,* 191 U. S. 64, 68; *Tex. & Pac. Ry. v. Harvey,* 228 U. S. 319, 321; *Gila Valley Ry. v. Hall,* 232 U. S. 94, 101; *Seaboard Air Line v. Horton,* 233 U. S. 492, 504.''

Speaking of a requested instruction, the court further said:

"The request required defendant to be acquitted if the usual method of doing the work was pursued, irrespective of the question of the negligence of the yard crew in carrying it out. Negligence in the doing of the work was the gravamen of plaintiff's complaint, in his declaration as in his evidence, and defendant was not entitled to an instruction making the pursuit of a customary system decisive of the issue, without regard to whether due care was exercised in doing the work itself. Even if plaintiff knew and assumed the risks of an inherently dangerous method of doing the work, he did not assume the increased risk attributable not to the method but to negligence in pursuing it.''

In *Seaboard Air Line R. v. Horton,* 233 U. S. 492, it is said:

"On the other hand, the assumption of risk, even though the risk be obvious, may be free from any suggestion of fault or negligence on the part of the employe. The risks may be present, notwithstanding the exercise of all reasonable care on his part. Some employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employe is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them."

In *Baltimore & Ohio R. Co. v. Groeger,* 266 U. S. 521, speaking of the boiler inspection act, the court said:

"That act was passed to promote the safety of employees and is to be read and applied with the Federal Employers' Liability Act. Under the latter, defendant is liable for any negligence chargeable to it which caused or contributed to cause decedent's death (§ 1); and he will not be held guilty of contributory negligence (§ 3) or to have assumed the risks of his employment (§ 4) if a violation of § 2 of the Boiler Inspection Act contributed to cause his death. See *Great Northern R. Co. v. Donaldson,* 246 U. S. 121, 124; *St. Louis & Iron Mountain R. v. Taylor,* 210 U. S. 281, 294; *Louisville & Nashville R. R. Co. v. Layton,* 243 U. S. 617, 620."

See, also, *Chesapeake & Ohio R. Co. v. De Atley,* 214 U. S. 310; *Reed v. Director General of Railroads,* 258 U. S. 92; *Wright v. Yazoo & M. V. R. Co.,* 197 Fed. 94; *Smith v. Payne,* 269 Fed. 1; *Davis v. Philadelphia & R. R. Co.,* 276 Fed. 187; *Portland Terminal Co. v. Jarvis,* 227 Fed. 8; 141 C. C. A. 562; *Lehigh Valley R. Co. v. Mangan,* 278 Fed. 85.

Our heretofore determined cases have also been in consonance with this rule: *Cules v. Northern Pac. R. Co.,* 105 Wash. 281, 177 Pac. 830; *Rasmussen v. Twin Harbor Stevedoring & Tug Co.,* 147 Wash. 260, 265 Pac. 1085. For a collection of the state cases on the question, see 45 U. S. C. A. § 54.

But it is said that the highest Federal court has, in the case of *Chesapeake & Ohio R. Co. v. Nixon,* 271 U. S. 218, departed from the doctrine of the earlier cases. The case was a review on certiorari to the supreme court of Virginia, and, from an examination of the facts of the case as stated by the Virginia court, it would appear that the question here involved was before the court. The court, however, did not discuss the question, nor announce that it intended to depart from its earlier holdings, and we cannot conclude that it did intend to do so. We reach the conclusion with less misgivings than we otherwise would, since it is within the power of that court to correct us if we have mistaken its views.

In our opinion, therefore, the trial court did not err in concluding that the decedent in this instance did not assume the risk of the injury which caused his death.

█ The appellant also complains of certain trial errors which, if well taken, will require a new trial. These relate to instructions requested and refused, and to instructions which the trial court gave to the jury. The appellant requested the court to instruct

the jury to the effect that a violation of any order of the employer promulgated for the safety of the employee is a risk assumed by the employee and sufficient to defeat a recovery entirely. But this, as we understand it, is not an accurate statement of the rule. Unquestionably, if the violation of the order was the sole cause of the injury—in this instance the death—there could be no recovery. But it must be remembered that the action is brought under the Federal employers' liability act, and that, under that act, negligence of the employee is not a bar to a recovery, but a matter affecting the amount of the recovery when the negligence is but a contributing cause to the injury. A correct instruction must take this element into consideration. It need hardly be added that disobedience of an order or of a rule of the company is negligence merely, not different in its legal effect than is negligence in other forms.

█ Instructions numbered by the court 5 and 6, which the court gave to the jury and to which the appellant excepted, state a correct rule of law. They but state the rule that, where the injury is caused by negligence on the part of the employee, combined with negligence on the part of the employer, a recovery is not barred.

█ Instruction No. 7 is as follows:

"It is the law that an employe assumes the risk of dangers which attend his work and which are open and well known. The defendant alleges that deceased had assumed the danger of being run down by trains, and the burden is upon defendant to show by the preponderance of the evidence that the danger of being run down by an oncoming train is one of the obvious dangers attending the occupation of trackwalker, and that it is open and well known, and if it has shown this, then, under the law, the defendant would not be liable, and your verdict in such case would be for the defendant."

The objection to the instruction is that it leaves to the jury the question whether the danger of being run down by a passing train was one of the obvious risks incident to the employment in which Cross was engaged at the time of his death, whereas, it is contended, that this is the principal if not the only risk attendant upon the employment, and that the court should have so charged the jury directly as matter of law, and not left it to them to be determined as matter of fact. Since the evidence incontestably shows that the risk of being run down by a train is one of the usual and ordinary risks incident to the duties of a track inspector, it is possible that no question was left for the determination of the jury as to the matter, and that it would not have been error for the court to so charge.

But such a charge, if followed by the conclusion the court drew therefrom in the instruction, would have ended the controversy; it would have been equivalent to a charge to find for the defendant. But it is evident that the court did not mean to convey to the jury what the literal meaning of its words imported. There was direct and positive evidence that the operators of the train did not operate it negligently or in violation of the rules of the appellant—that is to say, there was direct and positive evidence that the train was not run in excess of the speed limit, and that signals were given at all of the required places—and it is evident that it was to meet this situation that the instruction was given. That the language used was not very appropriate for the purpose, may be conceded, but we cannot concede that it misled the jury. Elsewhere in its instructions the court had defined with meticulous care the issues which the jury were required to determine, and this in language to which no just exception can be taken. It stated to them the two re-

spects in which it was claimed by the respondent that the appellant was negligent and charged:

"If the plaintiff fails to show by the preponderance of the evidence that the defendant was negligent in these two respects, i. e., speed of the train and the blowing of the whistle, then the defendant will not be liable to the plaintiff and you will give no consideration to the affirmative defenses referred to in subsequent instructions, but will return a verdict for the defendant."

And it charged them that negligence in the respects claimed would not warrant a recovery on the part of the respondent unless they further found that the negligence claimed was the proximate cause of the death. The instructions, when read as a whole, are plain and clear, and we cannot conceive that they were so far erroneous as to require a new trial.

The judgment is affirmed.

MITCHELL, C. J., FRENCH, MAIN, and HOLCOMB, JJ., concur.