[No. 29055.   Department Two. ¡ August 9, 1943.]

THE HOME INSURANCE COMPANY OF NEW YORK, *Respondent*, v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*.[1]

[1]Reported in 140 P. (2d) 507.

*Cannon, McKevitt & Fraser (Frank J. Blade,* of counsel), for appellant.

*Roy A. Redfield,* for respondent.

GRADY, J.—The Home Insurance Company of New York brought this action against the Northern Pacific Railway Company to recover a judgment for the loss of wheat by fire while in the possession of the defendant as a common carrier. After a trial before the court without a jury, a judgment was entered against the defendant for the value of the wheat as found by the court, from which the defendant has taken this appeal.

The substance of the complaint is that there was delivered by the Lewiston Grain Growers, Inc., to the defendant railway company two carloads of wheat, to be carried by it to its destination, and for which the defendant issued its uniform bills of lading; that thereafter the wheat was destroyed by fire; that, prior to the loss, the plaintiff had issued to the owner of the wheat a policy of fire insurance covering it and

other grain in the hands of any owner thereof; that, after the loss occurred, the plaintiff paid the amount thereof to the owner, and received an assignment of the cause of action therefor and became subrogated to the rights of such party; and that plaintiff then made claim to the defendant for the amount of the loss, but the defendant denied liability.

The answer of the defendant, after making certain admissions and denials, alleged affirmatively that the fire causing the loss was due to the negligence of the owner and shipper; and that, by reason of a certain provision contained in the bills of lading issued by the defendant (which will later be quoted and referred to), the plaintiff is barred from any recovery against it. The affirmative allegations of the answer were put in issue by the reply of the plaintiff.

On July 25, 1941, the Lewiston Grain Growers, Inc., operated a grain elevator on a branch line of the appellant at Ferdinand, Idaho. It was in close proximity to a sidetrack on which cars were switched and spotted at the elevator for loading. Grain was brought to the elevator and deposited in a bin eight or nine feet above the ground level. Running from the ground level to the top of the elevator was a wooden box, or chute, referred to as the "leg." At the bottom of the leg was a metal container, called the "boot." There was a shaft and pulley in the boot. The shaft revolved on babbit bearings. In the leg and running over the pulley in the boot was an electric power-driven belt, with a series of buckets attached to it. There was also another pulley in the leg at the top of the elevator, over which the belt and buckets ran and continued downward through another leg, and thus completed the circuit. On the floor above the boot was a screw conveyor, which conveyed the grain from the bin to the leg and into the buckets. The grain was then elevated by the revolving belt and buckets to a higher level, from which it fell by gravity through a

pipe into the car being loaded. The belt and buckets had but a small amount of clearance between them and the inside of the leg. The elevator, a wooden structure, was very dry, and there was an accumulation of dry dust in the leg.

On the morning of the day in question, the machinery had been inspected and lubricated. The two cars were loaded, and the machinery stopped and not started up again. The operation was completed shortly before four o'clock in the afternoon. At four o'clock the cars were sealed and the bills of lading issued. Just before six o'clock, two elevator employees, who were cutting weeds and clearing up around the outside of the elevator, heard a noise which they described as being like a wind blowing hard or that a draft would make. Other than the two employees, there was no person present in or about the elevator and had not been for sometime. When they reached the platform of the elevator, they could smell smoke, and they found a fire was burning in the leg and which appeared to be coming up from the boot. The fire gained rapid momentum and destroyed the elevator and the two cars of wheat.

The acts of negligence on the part of the shipper alleged by appellant in its answer was that it failed to maintain proper fire protection facilities and that its elevator was at a place where the nearest fire plug was five hundred feet away, and it had made no effort to correct these conditions. But such acts of alleged negligence are not urged in this court and need no further consideration. Neither is there any claim of negligence on the part of the appellant.

The appellant relies for its first defense on the following provision in the bills of lading:

"Sec. 1.    (b)    No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, the author-

ity of the law or the act or default of the shipper or owner."

This presents the question as to whether the appellant has sustained the burden of proof that the fire was caused by "the act or default of the shipper or owner" of the wheat, as no claim is made that it was caused by any of the other excepted acts.

The appellant was unable to produce any direct evidence as to the cause of the fire and necessarily had to rely on circumstantial evidence and inferences. If we understand the appellant's position correctly, it is that, as the fire had its origin in the boot and inside the elevator and neither it nor any third person contributed thereto in any way, then it must have been caused by some act or default on the part of the owner or shipper, using a process of elimination to arrive at this result. A circumstance relied upon by it is that the shaft bearings in the boot were babbit instead of roller bearings, which are of a more modern use, and babbit bearings, especially if they become worn or are not properly lubricated, are more likely to heat and cause ignition than would be the case if roller bearings are used. Babbit bearings have been in general use in elevator machinery for many years. The roller bearings have been installed in the newer elevators, but many of the older ones still retain the babbit bearings.

There seems to be no doubt that the fire started in the boot, but such evidence as there is in the record is to the effect that the bearings had been lubricated the morning of the day of the fire. All the machinery ran smoothly while being operated that day. If the bearings had become dry, they would have "squeaked," and it would have been known. And if they had become worn, such condition would have been made manifest by the way the conveyor belt would have acted. None of these things occurred.

The rule is well established that the existence

of a fact or facts cannot rest in guess, speculation, or conjecture. It is also the rule that the one having the affirmative of an issue does not have to make proof to an absolute certainty. It is sufficient if his evidence affords room for men of reasonable minds to conclude that there is a greater probability that the thing in question, such as the occurrence of a fire, happened in such a way as to fix liability upon the person charged therewith than it is that it happened in a way for which a person charged would not be liable. In applying the circumstantial evidence submitted to prove a fact, the trier of fact must recognize the distinction between that which is mere conjecture and what is a reasonable inference.

These principles are defined and discussed in many of our cases, and we cite among them the following: *Parmelee v. Chicago, M. & St. P. R. Co.*, 92 Wash. 185, 158 Pac. 977; *Prentice Packing and Storage Co. v. United Pac. Ins. Co.*, 5 Wn. (2d) 144, 106 P. (2d) 314; *Nelson v. West Coast Dairy Co.*, 5 Wn. (2d) 284, 105 P. (2d) 76, 130 A. L. R. 606; *Letres v. Washington Co-Op. Chick Ass'n*, 8 Wn. (2d) 64, 111 P. (2d) 594. The factual situation in each of the cases is different from the others and from the one now under consideration, but we cite them merely as an exposition of the principles which must guide us in deciding this case.

The appellant contends that, as babbit bearings are more likely to wear and become hot than roller bearings and, hence, create a greater hazard, and since the fire originated in the boot, the overheating of the bearings must have been the cause of the fire. It seems to us, however, that what was said by this court in the *Prentice* case, *supra*, p. 162, is applicable here:

"The pressure of the refrigerant *could* have caused the rupture if the pipe were worn to a thinness of approximately one ten-thousandth of an inch; the rupture did occur; therefore, the pipe must have been worn to the required point. This, however, is but reasoning

in a circle. It assumes a fact necessary to establish a cause of action, but concerning which assumed fact there is no evidence, and then employs the supposititious fact as the basis for a conjecture as to the possible cause of a particular physical result."

We believe that the claim made by the appellant as to the cause of the fire rests upon conjecture and speculation rather than upon the existence of any proven facts from which a reasonable inference may be drawn that the fire was the result of any act or default of the shipper, and that the trial court was correct in the conclusion it reached on this branch of the case.

The appellant also claims that, even though it may be liable to the shipper for the value of the wheat destroyed by fire, it is entitled to the benefit of the following provision in the bills of lading issued by it:

"Sec. 2. (c) Any carrier or party liable on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been effected upon or on account of said property so far as this shall not avoid the policies or contracts of insurance: Provided, that the carrier reimburses the claimant for the premiums paid thereon."

If this be a valid and enforcible provision of the bills of lading, then the respondent, having paid the insured owner its loss, cannot recover the amount so paid from the appellant.

■■ The general rule is that a provision in a bill of lading giving the carrier the benefit of insurance taken out by the shipper, is valid in the absence of anything contained in the insurance policy to the contrary. The reason for this rule is that the carrier has an insurable interest in the property delivered to it for transportation, and it can make a valid contract with the shipper to have the benefit of his insurance to reimburse it for what it pays him for the loss of such property; and the result is the same whether the carrier pays the shipper for the loss in the first instance and then makes claim to the insurer for reimbursement, or

whether the insurer pays the insured his loss and seeks reimbursement from the carrier, as was done in this case.

■ Ordinarily, an insurer of property lost or damaged while in the possession of a carrier, and for which the carrier is liable to the shipper, is subrogated to the rights of the shipper against the carrier when it pays the loss. But the insurer is subrogated only to such rights as the insured possessed, and, if the insured has contracted with the carrier that it may have the benefit of any insurance available to the shipper in case of loss or damage, such right of subrogation is defeated. *Phoenix Ins. Co. v. Erie & Western Transportation Co.* (1886), 117 U. S. 312, 29 L. Ed. 873, 6 S. Ct. 750; *Wager v. Providence Ins. Co.* (1893), 150 U. S. 99, 37 L. Ed. 1013, 14 S. Ct. 55; *Missouri Pac. R. Co. v. International Marine Ins. Co.* (1892), 84 Tex. 149, 19 S. W. 459; *North British & Mercantile Ins. Co. v. Central Vermont R. Co.* (1896), 75 N. Y. St. Rep. 427, 40 N. Y. Supp. 1113 (affirmed 158 N. Y. 726, 53 N. E. 1128); *Roos v. Philadelphia, W. & B. R. Co.* (1901), 199 Pa. 378, 49 Atl. 344; *Hartford Fire Ins. Co. v. Payne* (1921), 199 Iowa 1008, 203 N. W. 4, 39 A. L. R. 1109; *Yazoo & M. V. R. Co. v. Blum* (1921), 124 Miss. 318, 86 So. 805; 10 C. J. 515, § 836; 13 C. J. S. 880, § 399; 9 Am. Jur. 959, § 858; 39 A. L. R. (annotation) 1116.

The cases we have just cited are among those in which the courts were not confronted with provisions in insurance policies designed to avoid the effect of a provision in a bill of lading giving the carrier the benefit of the insurance. A review of them will show that, over a long period of time, there has been an effort by the carriers and the insurance companies, by ingenious devices and provisions in insurance policies and shipping contracts, to shift to the other the ultimate burden of loss of property while in the possession of carriers. But these cases are of no benefit in considering the questions before us, as the insurance policy issued to

the shipper by the respondent does not contain any provision affecting the right of the insured and a carrier to enter into a shipping contract whereby the carrier shall have the benefit of the insurance in the event of loss of insured property while in its possession and for which it is liable to the shipper.

The respondent meets this situation by making reference to § 2 of the act of Congress of 1887, known as the interstate commerce act, as amended by the transportation act of 1920, being 49 U. S. C. A., § 2, and the case of *China Fire Ins. Co. v. Davis*, 50 F. (2d) 389, 76 A. L. R. 1259 (certiorari denied, *Mellon v. China Fire Ins. Co.*, 284 U. S. 658, 76 L. Ed. 558, 52 S. Ct. 36), construing this statute and holding that a provision in a bill of lading similar to the one now before the court was invalid. The statute is as follows:

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property or the transmission of intelligence, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation or transmission of a like kind of traffic or message under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

Referring to the provision in the bill of lading, the court in the *China Fire Ins. Co.* case said, p. 392:.

"The clause put it in the power of the shipper at his pleasure to take out policies which might, or might not, contain the now usual clause that the underwriter should be liable only so far as the shipper did not recover from the carrier. Thus the shipper was free in effect to insure the carrier or not, as he chose, and while we are not advised whether this choice involved a difference in premium, it is certainly possible that this may

have been the case. In any event such insurance appears to us to be 'compensation' within the purport of the section. Certainly it had a present value, quite aside from whether it cost anything to the shipper, a value ascertainable by actuarial calculation. Nor does it matter that it was a favor from the shipper to the carrier, and not·vice versa. . . . The statute forbids any discrimination, whichever side profits. It is quite true that the same option was given to all shippers alike, but that is in effect no more than to say that each might so far favor the carrier as his interests dictated. Pro tanto the carrier's 'compensation' was left open to the action of the parties in the particular case, which is what the statute forbids."

The case was decided in 1931. The only case in which it is cited upon the point involved here is that of *The Steel Inventor,* 35 F. Supp. 986. Respondent contends that the reason there are no cases reported involving the question we have here is that the *China Fire Ins. Co.* case has settled the whole controversy, and the shipper's insurance is no longer available to the carrier. It is interesting to note that, although the act of Congress above referred to was passed in 1887, yet subsequent to that time none of the cases dealing with this question referred to the statute or used it as a basis for decision until the *China Fire Ins. Co.* case was decided. Even the one case subsequent to it that we have found, *Staple Cotton Co-Operative Ass'n v. Yazoo & M. V. R. Co.,* 189 Miss. 387, 197 So. 828, indicates the court would have followed *Yazoo & M. V. R. Co. v. Blum, supra,* had not a provision in the insurance policy then before the court made the general rule inapplicable. The court did not cite or follow the rule of the *China Fire Ins. Co.* case, which it might have done if it had agreed with it, and thus have reached the same result. Instead, it cited and followed a case decided by the United States supreme court *(Luckenbach v. W. J. McCahan Sugar Ref. Co.,* 248 U. S. 139, 63 L. Ed. 170, 39 S. Ct. 53, 1 A. L. R. 1522) approving the general rule.

■ When a Federal statute is construed by a United States court of appeals, such construction is entitled to great weight with us when the same statute is involved in a case we are considering, but it is not binding on us if we do not deem it logical or sound. There are some cases and texts which state broadly that the decisions of "Federal courts" construing Federal statutes are binding on the state courts, but an examination of them will disclose that what is referred to is the United States supreme court, not the Federal courts generally. We have found no case in which the question has been squarely presented holding that decisions of the inferior Federal courts on any Federal question are binding on the state courts, or are anything more than persuasive and entitled to great weight. *Noble v. Dibble*, 119 Wash. 509, 205 Pac. 1049; *Oregon-Washington R. & N. Co. v. C. M. Kopp Co.*, 12 Wn. (2d) 146, 120 P. (2d) 845, 138 A. L. R. 633; Black's Law of Judicial Precedents, p. 372, § 113; 14 Am. Jur. 339, § 121.

The author of the last authority cited *Cross v. Spokane, Portland & Seattle R. Co.*, 158 Wash. 428, 291 Pac. 336, 71 A. L. R. 451, as holding that state courts are bound by the construction given Federal statutes by "Federal courts." But it will be observed from a critical reading of that case that, although it was said by the writer of the opinion, p. 436, "The question is, of course, controlled by the decisions of the Federal courts," yet it is stated in another part of the opinion, p. 434, when referring to the Federal statute involved, "This has been construed by the *authoritative court.*" (Italics ours.) It is clear that the court was referring to the United States supreme court. In order that there may be no doubt about what the rule is in this state, we now declare it to be that the construction placed upon a Federal statute by the inferior Federal courts, while entitled to great weight by the courts of this state, is not binding upon them.

■ The purpose of the statute (49 U. S. C. A., § 2) is stated by the code annotator as follows, p. 139:

"The purpose of this section is to enforce equality between shippers over the same line, and to prohibit any rebate or other device by which two shippers, shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay different prices therefor."

Many Federal cases are cited.

The provision in the uniform bills of lading before us giving the carrier the benefit of insurance on the goods for which it is liable, is no more than a recognition on the part of the shipper that he is not entitled to recover the loss from the carrier and retain the same as well as the insurance money received from the insurance company. The insurance company is compensated for the risk it assumes. When there is a loss, it should bear the burden. It can make no difference to it whether it pays the insurance to the insured or to someone for whose benefit the insurance was taken out.

The carrier is required, if it gets the insurance, to reimburse the insured for the premiums it has paid. By becoming the beneficiary of any insurance which the shipper has contracted for, the carrier does not render service to a shipper for any less rate than the regular published tariff rates charged to all shippers. The insurance is not given or received as any compensation for service, but is merely to reimburse the carrier for what it has paid to the shipper for the property loss, which reimbursement it might have received had it contracted therefor direct with the insurer. It would seem that it logically follows that, if the carrier can secure insurance from an insurer to protect itself against loss, it can be the beneficiary of such insurance by contract with the shipper.

We are of the opinion that the Federal statute above referred to was not designed to forbid the making of a contract between a shipper and a carrier whereby

the carrier may become entitled to any insurance contracted for by a shipper to reimburse it for loss paid to the shipper.

The judgment is reversed and the cause remanded, with instruction to the trial court to enter a judgment of dismissal.

SIMPSON, C. J., BEALS, BLAKE, and ROBINSON, JJ., concur.

September 15, 1943. Petition for rehearing denied.