[No. 29162. Department Two. March 4, 1944.]

JOHN VITALICH et al., *Appellants*, v. THE PORT OF
SEATTLE, *Respondent*.[1]

*Henry Clay Agnew, Monheimer, Griffin & Schermer,
Edgar C. Snyder, Clarke & Clarke*, and *F. C. Peterson*, for
appellants.

*Glenn J. Fairbrook* and *William J. Truscott*, for re-
spondent.

ROBINSON, J.—This appeal includes four actions, brought
separately, against the port of Seattle, but consolidated for
trial. It appears that there was considerable variance in
the four complaints. Only one of the four appears in the
transcript of record furnished to this court. However,
since none of the parties excepted to instruction No. 1, we
take it that it stands accepted as constituting a correct

[1]Reported in 146 P. (2d) 819.

statement of the issues raised and tried. In this instruction, the members of the jury, after hearing the evidence and visiting and inspecting the premises, were told:

"Each plaintiff alleges that the Port of Seattle operated a storage warehouse on property known as the Salmon Bay Terminal or Fishermen's Docks; that the improvements on said property consisted of wharves and docks at which owners of fishing vessels were invited to and did berth their boats; that there were buildings designed, equipped and used for the repair of vessels; that there existed facilities for hanging nets, tarring, tanning and treating nets in various and sundry manners, and that over this whole area the defendant Port at all times maintained and exercised control; that in the year 1937 the defendant Port built and constructed on said property a building known as Net Warehouse No. 3, which building was 200 feet long and 60 feet wide, with a corridor extending the length of the building down the middle thereof, on either side of which corridor was a tier of locker rooms, the doors from which opened into the corridor; and back of these tiers on either side of the building was another tier of locker rooms accessible from the outside of the building.

"It is further alleged that the defendant Port of Seattle operated said building as a public storage warehouse where it received for storage for compensation nets and fishing equipment; that prior to February 24, 1942, each of the several plaintiffs had rented a locker or lockers in said warehouse, and that each plaintiff had on that day nets and/or equipment of the value claimed, in the locker by such plaintiff rented.

"On the 24th day of February, 1942, a fire occurred, destroying Net Warehouse No. 3 and the property of the respective plaintiffs.

"The respective plaintiffs claim that the fire was caused by the negligence of the defendant Port of Seattle in that (1) it failed to take any proper steps to prevent the outbreak of the fire when it knew, or by the exercise of reasonable care on its part should have known, of the perilous condition to which said warehouse was then exposed; and (2) that the defendant Port was negligent in that it neglected to maintain in the warehouse portable fire extinguishers, as required by the ordinance of the City of Seattle.

"The defendant Port of Seattle by its answer denies any negligence on its part and any consequential damage to

the plaintiffs or any one of them, and by such denial the burden is placed upon each plaintiff to prove by a fair preponderance of the evidence that the defendant Port was guilty of negligence as such negligence is hereinafter defined, and that the negligence of the Port was a proximate cause of the fire and the ensuing loss to each plaintiff."

The jury returned a verdict for the defendant. We find no motion for a new trial in the transcript of record on appeal. It appears of record, however, that such a motion was made and denied, and we will assume that it was broad enough to justify the two assignments of error made in appellants' brief.

The appellants submit that the court erred:

"1. In refusing to give plaintiffs' requested instruction No. 4."

Plaintiffs' requested instruction No. 4 read as follows:

"You are instructed that the law of the State of Washington in regard to the operation of warehouses such as the one here involved provides:

" 'Every warehouseman shall furnish and supply such warehouses, buildings, structures, service, instrumentalities, and facilities that shall be safe, adequate and efficient and in all respects just and reasonable.' "

The quoted portion of the requested instruction is taken from Rem. Rev. Stat. (Sup.), § 11569-3 [P. C. § 7202-23]. It came into our law as a part of § 3 of chapter 154, Laws of 1933, p. 555, and was retained in the amendatory act, chapter 202, Laws of 1937, p. 981. The title of chapter 154 (closely followed by that of the amendatory act) reads as follows:

"AN ACT relating to storage warehouses and warehousemen in any incorporated city, or city and county, of this state having a population of thirty thousand or more, defining the same, providing for the regulation and supervision thereof by the department of public works, providing for the enforcement of the provisions of this act and penalties for the violation thereof."

It was contended by the appellants at the trial, and is contended here, that that portion of the act, contained in

the requested instruction, repealed, by implication, that portion of Rem. Rev. Stat., § 3607 [P. C. § 7161], Laws of 1913, chapter 99, p. 286, § 21, which reads as follows:

"A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care."

The respondent points out that this language is a part of the uniform warehouse receipts act, passed in this state in 1913, for the purpose of making our warehouse law conform to that of the twenty-two other states which had previously adopted the uniform act. By 1933, uniformity had been achieved in forty-four states (now forty-seven), and it is contended that it is unthinkable that our 1933 legislature intended to destroy that uniformity. It is further urged that, even if it so intended, it could not lawfully carry out that intention without giving some notice of it in the titles to chapters 154, Laws of 1933, and 202, Laws of 1937.

It is further contended by respondent that there is no repugnancy in the two acts. On this score, it is said that the 1913 act (chapter 99) defines the liability of warehousemen as to goods warehoused, while the purpose of the 1933 act (chapter 154) is to give authority to the department of public works to regulate warehouses, and that the sentence therefrom which the appellants requested the court to include in its instructions merely lays down the standards which the legislature desired the department of public works to enforce in regulating their construction and facilities. The words which the court refused to read to the jury will bear repetition at this point:

"Every warehouseman shall furnish and supply such warehouses, buildings, structures, service, instrumentalities, and facilities that shall be safe, adequate and efficient and in all respects just and reasonable."

In our opinion, the circumstances do not require us to decide whether or not the enactment of chapter 154,

Laws of 1933, repealed or modified the rule of liability of warehousemen, as stated in chapter 99, Laws of 1913. The language, just quoted, is not germane to the issues in the case, as given to the jury in instruction No. 1 and accepted by the numerous plaintiffs in the consolidated case. There was no claim that the warehouse building in which the goods of the various plaintiffs were stored was, in and of itself, inadequate, unsafe, or inefficient. The real issue has to do with the claim that the defendant, port of Seattle, permitted a fire hazard near the warehouse, and was, therefore, chargeable with the lack of requisite care for the goods stored therein. This the instructions adequately covered. We quote a portion of instruction No. 5:

"If you find by a fair preponderance of the evidence that the existence and maintenance of the 'boat shed' constituted a fire hazard, and the defendant Port of Seattle, the 'warehouseman' in this case, knew, or in the exercise of reasonable care on its part should have known, that the condition of the boat shed constituted a fire hazard to the warehouse, and that such warehousemen, in the exercise of such care as a reasonably careful owner of the goods stored in the warehouse would have exercised, should have taken steps to remove such fire hazard or to have protected the warehouse against such fire hazard and failed so to do, and that such failure was the proximate cause of the fire and the ensuing damage, then the defendant Port would be liable to any plaintiff suffering damage by reason of the failure of the defendant to exercise such degree of care.

"On the other hand, if you do not find that the defendant Port of Seattle failed to exercise that degree of care in maintaining the boat shed, under the circumstances and conditions then and there existing, which a reasonably careful owner of goods such as those stored in Warehouse No. 3 would have exercised, then the defendant Port of Seattle would not be liable to the plaintiffs, or any of them, because of its maintenance of, or the existence of, said boat shed."

We find no error in the refusal of the court to give plaintiffs' requested instruction No. 4.

The second assignment of error has to do with the trial court's instruction No. 7. Appellants excepted to the following paragraph thereof:

"Evidence has been introduced concerning the maintenance of an open fire in the vicinity of the warehouse during the day on which the fire occurred. Evidence has also been introduced concerning the probability that men were smoking in or about the adjacent building generally denominated as 'the boat shed' on such day. The evidence is undisputed that the fire broke out in and quickly spread through the boat shed and in a short period of time spread to the warehouse where the goods of the plantiffs were stored. You are instructed that the evidence is insufficient upon which a verdict could be predicated fixing the cause of the fire in the boat shed, and any suggestion that the fire in the boat shed was ignited by reason of the negligence of the defendant Port in permitting such open beach fire, or that the fire was ignited by some act of men in the boat shed, is withdrawn from your consideration as wholly speculative and conjectural."

For many years, the port of Seattle has maintained a terminal at Salmon bay for the use and convenience of the fishing fleet. There are moorage grounds for fishing vessels, marine ways, machine shops, and other facilities, among them, three large wooden buildings, divided into compartments of lockers which are rented to fishermen for storage of their nets and gear. The building in which the property of plaintiffs was destroyed was one of these, and is quite fully described in *Port of Seattle v. Luketa*, 12 Wn. (2d) 439, 121 P. (2d) 951. It was erected in 1937, in accordance with the provisions of the Seattle building code and under the inspection of the city authorities. A fisherman who rented a locker in the building received the key thereto and complete dominion over it, storing what he pleased and when he pleased and withdrawing it with equal freedom. The rental paid for the locker entitled him to moorage for his vessel, the use of the marine ways, and other facilities. Fishermen used all of these as pleased them, subject to the general supervision of the port.

When warehouse No. 3 was constructed, an existing building called the "boat shed" was left standing alongside it. This was a ramshackle affair, with the roof largely missing and the front entirely open to the weather. The fishermen

were accustomed to treat their nets in this building with copperoleum, a preparation which becomes highly inflammable and gives off an inflammable vapor when a thinner is used. On the day of the fire, a large net was being treated in the boat shed.

Down near the water's edge, fifty to sixty feet from this building, and in accordance with long-continued custom, some of the fishermen had a small fire going. It was constructed by piling up a few bricks on three sides, leaving one side open for the insertion of fuel. On top of the bricks rested a large tin can filled with wax. The purpose of the fire was to thin the wax. When melted, the fishermen dipped their corks therein in order to give them a wax coating.

There is much testimony to the effect that the operation had been discontinued for some time before the fire broke out in the boat shed and the fire had died down. There is some testimony, however, which a jury would have had the right to believe, that it was emitting sparks shortly before the boat shed began to blaze. It seems to be admitted that the wind, as to the boat shed, was coming from the direction of the fire near the beach; hence, it is contended that the jury could have reasonably found that permitting the fire to be maintained for the heating of the wax was the proximate cause of the fire which destroyed the property of the various plaintiffs. The trial court felt that such a conclusion could only be arrived at by pure speculation, as distinguished from legitimate inference.

There was no direct evidence in support of appellants' theory. Appellants rightly point out that direct evidence is not necessarily required and that a fact may be proven by a chain of circumstances, citing *Hinckley v. Shell Co. of California*, 127 Wash. 630, 221 Pac. 594, and a number of other cases most of which are cited in our comparatively recent decision in *Nelson v. West Coast Dairy Co.*, 5 Wn. (2d) 284, 105 P. (2d) 76, 130 A. L. R. 606. The chain of circumstances relied upon seems to be that liquid giving off inflammable vapors was being used to treat nets in the boat

shed. There was a fire on the beach only fifty to sixty feet away. There was a wind blowing from that direction. Could a conclusion that the inflammable vapor in the boat shed was ignited by a spark from the fire on the beach be arrived at by a legitimate inference or would such a conclusion, under the circumstances, rest on mere speculation?

One who contends that the inference is legitimate is immediately confronted with the undisputed evidence that the fire began, not in the net that was being treated, but in an old net that was lying in a heap in the corner of the shed. Then, too, he would be forced to clear away other possible and probable causes. Since the vapors from the copperoleum were highly inflammable, they might have been ignited by the backfire of one of several automobiles which were coming and going near the shed, or by a cigarette which a fisherman carelessly threw away, or by the striking of a match to light a pipe or cigar. It is true there is no evidence that anyone was seen smoking in that vicinity at the time, but there were a number of fishermen working or going to and fro about the premises, and it was brought out that Marco Legaz, one of the numerous plaintiffs in the consolidated action, had given a pre-trial deposition in which he testified, in part, as follows:

"Q. Were the men that were smoking, were they the ones that were using the wax? A. Well, they were smoking inside and outside, inside the shed there, that open shed there, with the nets hanging there."

Of all of the plaintiffs in the consolidated cause, Marco Legaz had suffered the greatest loss. His claim was for more than twenty-two thousand dollars. Since his testimony was against interest, it was particularly damaging to the plaintiffs' cause, and his counsel, acting for him and his coplaintiffs at the trial, naturally attempted to weaken this testimony by redirect examination, with somewhat disastrous results. We quote:

"Q. Did you see men smoking there at 4:00 o'clock the day of the fire? You had just generally observed the men usually smoke there? A. The men would smoke any place.

Q. Do you remember for sure whether anybody was smoking at 4:00 o'clock the day of the fire or do you just think that they were? A. I could not answer that question. I don't remember. Q. You have an impression though that they might have been? A. Oh, yes. Q. But are you sure about it? You are not sure of it, are you? A. I am sure that they do. If they didn't it wouldn't have gotten afire. Q. What do you consider the most dangerous — A. My opinion is that these nets were not burned up because of the fire on the beach. They got burned because they did smoke."

In a very recent opinion in the case of *Home Ins. Co. v. Northern Pac. R. Co.*, 18 Wn. (2d) 798, 140 P. (2d) 507, involving the cause of a fire, the difference between legitimate inference and conjecture is discussed at length, accompanied by the citation of many cases. We think that, under the reasoning of that opinion and the cases therein cited, the court properly withdrew the issue as to whether the maintenance of the fire on the beach was the proximate cause of the destruction of the warehouse. It might have been, or may have been, but the evidence was not sufficient to justify a finding that it was or even that it probably was.

The judgment of the trial court is affirmed.

SIMPSON, C. J., MILLARD, BLAKE, and MALLERY, JJ., concur.