IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 80348-4-I |
| | ) | |
| Respondent, | ) | ORDER GRANTING MOTION |
| | ) | TO REPLACE VICTIMS' NAMES |
| v. | ) | WITH INITIALS IN THE |
| | ) | COURT'S OPINION AND |
| TEDGY CARNELL WRIGHT, | ) | WITHDRAWING AND |
| | ) | SUBSTITUTING OPINION |
| Appellant. | ) | |

Respondent the State of Washington filed a motion to withdraw the published-in-part opinion filed in this case on July 6, 2021 and substitute the opinion with one that replaces the living adult victims' names with initials. The panel has determined that the motion should be granted and that the opinion filed on July 6, 2021 be withdrawn and a substitute opinion filed using the victims' initials. Now, therefore, it is hereby

ORDERED that the opinion filed in this case on July 6, 2021 shall be withdrawn and a substitute opinion shall be filed that replaces the victims' names with initials.

_____
Brennan, J

_____
Coburn, J.

_____
Chun, J

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 80348-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED IN PART OPINION |
| | ) | |
| TEDGY CARNELL WRIGHT, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Tedgy Carnell Wright appeals several convictions resulting from a jury trial involving joined charges for two separate victims. Wright contends reversal is required because a jury question amounted to a statement of deadlock and the trial court violated his constitutional right to be present when it consulted with counsel in his absence. We hold that the jury question was not a declaration of deadlock prompting a critical stage in the proceedings and the court did not violate Wright's right to be present. In the unpublished part of this opinion, we conclude that the trial court did not abuse its discretion by denying Wright's motion to sever his charges and his counsel's failure to renew that motion did not prejudice Wright based on the evidence as it developed at trial. And the trial court did not deprive Wright of confrontation clause protections by excluding impeachment evidence, the prosecutor did not commit reversible

misconduct during closing, and the court did not abuse its discretion by admitting two photomontages using Wright's booking photograph. Finally, cumulative error did not deprive Wright of a fair trial. We affirm.

FACTS

Wright appeals joined charges related to two separate incidents, one involving J.B. and one involving N.F.

J.B. Incident

J.B. is a single mom with a young son. She started working as an escort in 2018, advertising her services on websites. On May 29, 2018, a man, later identified as Wright, asked about engaging her services. She agreed to meet him at her home in Auburn.

J.B. let Wright in the house and he "immediately" began undressing. When Wright was undressed, J.B. noticed that "his body was saggy," as if he had "lost a lot of weight." Wright "said something about oral . . . without a condom," and J.B. "told him no." Wright "got upset" and began putting his clothes on. As he dressed, Wright took a silver gun out of his jacket. J.B. told him to leave because she did not allow guns in her home. Wright "refused," took J.B.'s cell phone out of her hand, and told her to go upstairs. Wright threatened that if she "said anything about what's going on, . . . he'd kill [her] and [her] son."[1]

---

[1] J.B. testified that her son was not home, but there were photographs of J.B. and her son on the walls.

Once they were upstairs, Wright "started basically telling [J.B.] what to do" while pointing the gun at her. He forced her to give him oral sex. Then Wright put on a condom and forced her to have vaginal sex. Afterward, Wright had J.B. walk with him to the bathroom, where she thought he put the condom in the toilet and washed his hands.

Wright returned to the bedroom and put on his clothes. He began searching J.B.'s room and her dresser while holding the gun. He took a pair of black Air Jordan tennis shoes with pink soles, two gold and diamond "grills,"[2] a picture of J.B. and her "ex," and J.B.'s wallet. He returned J.B.'s cell phone before he left in what "looked like" a black "newer Chrysler."

After Wright left, J.B. was "scared" to call the police so she "called somebody close to [her]." The friend went to J.B.'s home and told her that she "needed to call the police." J.B. then called the police, who came to her home to take her statement and photographs. She also went to the hospital for a sexual assault examination. A forensic scientist from the Washington State Patrol Crime Laboratory (WSPCL) later testified that male DNA[3] obtained from the perineal swabs in J.B.'s sexual assault kit matched a reference sample from Wright.

---

[2] Mouthpieces.

[3] Deoxyribonucleic acid.

3

N.F. Incident

N.F. was not actively working as an escort. But she had advertised escort services online in the past, and some of her posts remained on the Internet. N.F. communicated with Wright over social media for a few months before they met. Wright would text N.F. asking to meet, but she ignored him because she had a boyfriend. In early June 2018, N.F. texted Wright that she was "ready and available" for sexual services because she was single. She agreed to meet him on June 17.

N.F. met Wright at a Subway restaurant in SeaTac. She parked her car and got into Wright's gray/silver Chrysler 200, where they talked for a while. Wright told N.F. he had friends that would pay her for sex. Wright offered to take N.F. for a drink, but N.F. did not want to leave her car at the Subway. So they decided to drop off N.F.'s car at her home and then "go by the water and just drink."

Rather than drive to the water, Wright drove N.F. to an apartment in Skyway. Once there, they listened to music and drank. Wright got "frisky" and offered N.F. $100 for oral sex. N.F. agreed. Wright gave her a $100 bill, and they went to the bedroom, where N.F. performed oral sex. At some point, Wright took off his shirt. N.F. made "a look of disgust" after seeing that Wright had a lot of "extra skin . . . hanging down." Wright became "upset" and asked for his money back. When N.F. refused, Wright "went crazy." He "threw [her] on the ground," choked her with both hands around her neck, and vaginally raped her.

Afterward, N.F. went to the bathroom to check if Wright had been wearing a condom. She did not find one. When she returned to the bedroom to get dressed, she saw that Wright had a silver gun with a black handle and was going through her purse. N.F. and Wright fought over her purse. During the struggle, N.F. ripped the window blinds in the bedroom. Wright pulled off N.F.'s wig and false eyelashes and struck her in the head multiple times with his gun. N.F. tried to "sneakily" call 911 from her cell phone, but Wright "caught" her, took her phone, and "pistol whipped" her more. Wright then told N.F. that he saw her identification in her purse and if she did not "follow[ ] his directions," "I know where you live, I'll kill you and your whole family."

Wright ultimately gave N.F. her wig and clothing back and told her to get dressed. "He kept the gun in his hand the whole time." He told her to get in his car and then left her in Tukwila. Wright returned her two cell phones but kept her purse. N.F. called 911 and later directed officers to the Skyway apartment, identifying the unit by its broken blinds. Police took N.F. to a hospital, where she underwent a sexual assault examination, received stitches for the wounds on her head, and gave a statement to a detective.

The detective testified that at an interview the next day, N.F. said that Wright had taken $1,300 in cash from her purse and that she had marked the $20 and $100 bills with a "P" on the bottom right-hand corner of each bill. At a later search of the Skyway apartment, officers recovered $1,240 in $20 and $100 bills marked with a "P" and a locked toolbox containing a black and silver handgun. The detective also testified that officers found "black and pink

5

Jordan's" in the Skyway apartment. The shoes appeared to be the same as those worn by J.B. in a photograph and matched her description of the shoes Wright stole from her apartment.

A WSPCL forensic scientist testified that vaginal swabs from N.F.'s sexual assault kit showed female DNA that matched N.F. and male DNA that matched Wright.

Trial

The State charged Wright with rape in the second degree of N.F.; robbery in the first degree of N.F. with a firearm enhancement; assault in the second degree of N.F. with a deadly weapon and a firearm enhancement; unlawful possession of a firearm in the first degree, committed on or about June 17, 2018; rape in the first degree of J.B. with a firearm enhancement; and unlawful possession of a firearm in the first degree, committed on or about May 29, 2018.

Wright moved to sever the two counts related to J.B. from the four counts related to N.F.. He also moved to sever the two unlawful firearm possession counts from the other charges involving each alleged victim. The trial court denied Wright's motion to sever the counts as to each victim but bifurcated trial on the two unlawful possession of a firearm charges from trial on the other counts. After the court considered the strength of the State's cases, Wright's defense of "general denial" for both victims, the court's ability to instruct the jury, the cross admissibility of evidence, and judicial economy, the court concluded:

> The important consideration of judicial economy is served by trying these cases together. There already will be a bifurcated trial on firearms charges. Given the cross-admissibility of the evidence, there is no need for two trials involving such similar cases.

During discovery, Wright saw documentation that J.B. received $15,000 in lost wages benefits through the Department of Labor and Industries Crime Victims Compensation Program (CVCP). He told the court that there were "some questions" about "the veracity" of her application to CVCP. Wright later subpoenaed a CVCP claims consultant to testify at trial, intending to offer "relevant evidence that goes to [J.B.'s] bias of financial interest in the outcome of this case." Wright also intended to show that J.B. falsely represented that she worked as a receptionist for City Live Barbershop on her CVCP benefits application. The trial court quashed the subpoena. The court told defense, "[Y]ou can certainly ask [J.B.] about the representation she made to [CVCP] . . . as part of assessing her credibility," but "we're not litigating whether the claim was properly paid or not, because that is collateral."

Before trial, the State moved to preclude defense counsel from asking whether J.B. had reported any income from City Live Barbershop to the IRS.[4] The State argued the question "has no bearing on the issues of this case" and "its probative value is super low." Defense counsel asserted that the evidence "would establish that [J.B.] has no corroboration of her claim that she did in fact receive payment as she claims from City Live Barbershop" and that it was "relevant and material to the Defense that [J.B.] is not a credible person." The trial court granted the State's motion, noting that defense counsel already planned to call Gloria Wimberly, the barbershop's owner, to testify that J.B. was not in fact employed at the barbershop. The trial court also granted the State's

---

[4] United States Internal Revenue Service.

motion to exclude all evidence or questioning about the Wells Fargo debit card that J.B. reported stolen by Wright. The court allowed defense only to "cross-examine [J.B.] about what she told the investigators and . . . if her story has changed over time."

After jury selection began but before the court empaneled a jury, defense counsel renewed Wright's motion to sever the counts related to J.B. from those related to N.F. to preserve the issue for appeal. Defense counsel did not provide any more argument about the motion. The court denied the renewed motion to sever but noted that Wright had preserved the issue for appeal.

Trial testimony began on March 26, 2019 and continued for two weeks. Wright did not testify but the court admitted a recorded statement he made to a detective on the day officers arrested him for the N.F. incident. Wright's defense theory as to the rape counts was consent. Defense counsel argued that Wright had paid J.B. for sex, pointing to evidence that at her defense interview, J.B. said Wright gave her two $100 bills "upon his entering her residence." Defense counsel also argued that J.B. was not credible, pointing out the inconsistencies in her various accounts of the incident and that she lied on her CVCP application about working for City Live Barbershop. As to N.F., defense counsel pointed out that although N.F. testified she was not posting advertisements as an escort at the time, she texted Wright that she was "ready and available" for sex work. Defense counsel also argued that N.F. agreed to go into the Skyway apartment and later agreed to perform oral sex.

On Thursday, April 11, 2019, the parties made closing arguments on all but the unlawful possession of firearm counts. After the State's closing, Wright moved for a mistrial. He asserted that during closing argument, the prosecutor impermissibly vouched for the victims' credibility, commented on facts outside the record, and improperly argued that "one crime proved the other." The court denied the motion.

The jury began deliberating Thursday afternoon. On the morning of the following Tuesday, the jury inquired, "If we are unable to reach a verdict on a count, what happens?" The trial court conferred with defense counsel and the State, and they agreed to tell the jury, "See your instructions, particularly instructions #10 and #28." Wright was not present during the conference.[5]

On Tuesday afternoon, the jury returned guilty verdicts on the rape, robbery, and assault counts as charged.[6] By special verdict, the jury found Wright guilty of the firearm enhancements related to the assault and two rape charges.[7]

Wright moved to arrest the judgment and for a new trial on multiple grounds. He argued among other things that "a new trial should be granted because the trial court erred in failing to have [Wright] present upon its

---

[5] The conference itself is not in the record, and the trial court did not promptly memorialize the conference on the record. Instead, the only reference to the conference is during a later hearing on Wright's motion for a new trial.

[6] The trial court later vacated the conviction for assault of N.F. in the second degree based on the parties' agreement that it merged into the robbery charge.

[7] The trial then proceeded on the two unlawful possession of a firearm charges. The jury found Wright guilty of both unlawful possession of a firearm counts. Wright does not appeal these convictions or the court's decision to sever the unlawful possession of a firearm counts from the other charges.

consideration and response to a jury question that arose during jury deliberations." The trial court denied Wright's motion. The court acknowledged that Wright was not present at the conference but concluded that the law is "pretty clear that the matter of a jury question, at least on a point of law as was involved here, is not considered a critical phase of the proceeding for which the Defendant's presence is required."

The trial court sentenced Wright to an indeterminate sentence of 438 months. Wright appeals.

ANALYSIS

Right To Be Present

Wright contends the trial court deprived him of his right to be present during "a 'critical stage' of the trial" when it consulted with counsel about a jury question in his absence. We review de novo whether a trial court violated a defendant's constitutional right to be present. State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011).

A criminal defendant has a constitutional right to be present at all critical stages of a trial under article I, section 22 of the Washington State Constitution as well as the due process clause[8] and the Sixth Amendment to the United States Constitution. Irby, 170 Wn.2d at 874. The core of this right is "the right to be present when evidence is being presented or whenever the defendant's presence has 'a relation, reasonably substantial,' to the opportunity to defend against the charge." State v. Bremer, 98 Wn. App. 832, 834, 991 P.2d 118

---

[8] U.S. Const. amend. XIV.

10

(2000) (quoting In re Pers. Restraint of Lord, 123 Wn.2d 296, 306, 868 P.2d 835 (1994)). But the right is not absolute. Irby, 170 Wn.2d at 881. Rather, " 'the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence.' " Irby, 170 Wn.2d at 881 (quoting Snyder v. Massachusetts, 291 U.S. 97, 107-08, 54 S. Ct. 330, 78 L. Ed. 674 (1934)). A defendant does not have a right to be present when his " 'presence would be useless, or the benefit but a shadow.' " Irby, 170 Wn.2d at 881 (quoting Snyder, 291 U.S. at 106-07).

Generally, a defendant does not have the right to be present during in-chambers or bench conferences on legal matters that do not require the resolution of disputed facts. Lord, 123 Wn.2d at 306. For example, in State v. Sublett, 156 Wn. App. 160, 178, 231 P.3d 231 (2010), aff'd, 176 Wn.2d 58, 292 P.3d 715 (2012), a deliberating jury submitted a question to the court seeking clarification about the definition of "intent." Counsel and the judge met in chambers without the defendant to address the jury's question. Counsel agreed to answer the question by referring the jury back to their instructions. Sublett, 156 Wn. App. at 178. Sublett appealed his conviction, arguing that he had a right to be present when the court and counsel addressed the jury's question. Sublett, 156 Wn. App. at 181. We held that the conference "was not a critical stage of the proceedings because it involved only the purely legal issue of how to respond to the jury's request for a clarification in one of the trial court's instructions." Sublett, 156 Wn. App. at 183.

11

By contrast, a defendant has a constitutional right to be present when the court is responding to a declaration from a jury that they are "deadlocked." State v. Burdette, 178 Wn. App. 183, 201, 313 P.3d 1235 (2013). In Burdette, the jury sent a message to the court that stated, " 'Jury is deadlocked over several issues relating to the defendant's intent.' " Burdette, 178 Wn. App. at 189. This "bald assertion of deadlock" came only a few hours after the jury began deliberating. Burdette, 178 Wn. App. at 196. After consulting with counsel in chambers without the defendant, the court instructed the jury, " '[P]lease continue to deliberate in an effort to reach verdicts.' " Burdette, 178 Wn. App. at 189.[9] The jury acquitted Burdette of one charge but returned a guilty verdict on the other. Burdette, 178 Wn. App. at 189.

Burdette appealed his conviction, arguing he had a right to be present when the court discussed its response to the jury's communication. Burdette, 178 Wn. App. at 189-90. We held that although the communication did not require the resolution of facts, "the defendant's presence at this stage has a direct relation to the fullness of his opportunity to defend against the charge." Burdette, 178 Wn. App. at 201. We explained:

> To a defendant, all may pivot on how long the court will require a deadlocked jury to continue deliberations before declaring a mistrial. In some situations, a defendant may desire a quick mistrial and in others more deliberations in hope of an acquittal. Whatever the case, much is at stake at this stage and a defendant may reasonably wish to actively participate by making his opinion known to his lawyer or, if allowed, to the judge.

Burdette, 178 Wn. App. at 201.

---

[9] Alteration in original.

Wright argues that <u>Burdette</u> should control here because "[l]ike the jury's question in <u>Burdette</u>, the question from Mr. Wright's jury related to deadlock." But the jury in <u>Burdette</u> did not pose a question. It made a "bald assertion of deadlock," which required the defendant's presence for participation in strategic decision-making about whether to seek a mistrial. <u>Burdette</u>, 178 Wn. App. at 195-96.

Here, the jury heard testimony from several witnesses over two weeks about four separate charges involving two victims. After one and a half days of deliberations, the jury asked the trial court, "If we are unable to reach a verdict on a count, what happens?" Unlike <u>Burdette</u>, the jury's question was not an assertion of deadlock. Rather, it was a question about how to proceed in the event they were unable to reach a verdict on one of four separate counts.[10] Resolution of the jury's question called for clarifying the court's instructions related to the deliberation process—a purely legal question. The court and counsel agreed to answer the question by referring the jury back to the instructions as a whole, and "particularly" instructions 10 and 28.

Jury instruction 10 stated, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Instruction 28 stated, in pertinent part:

> When you begin deliberating, you should first select a
> presiding juror. The presiding juror's duty is to see that you discuss

---

[10] The dissent contends this case is similar to <u>Burdette</u> because "the jury indicated that it was having trouble agreeing even though it did not use the term 'deadlock.' " Even if that were true, it still ignores that the jury question related to only one of four counts. Any discussion about whether to declare a mistrial and discharge the jury—the critical stage identified in <u>Burdette</u>— would not occur until after the jury had fully considered all four counts separately.

13

the issues in this case in an orderly and reasonable manner, that you discuss each issue submitted for your decision fully and fairly, and that each one of you has a chance to be heard on every question before you.

. . . .

You must fill in the blank provided in each verdict form the words "not guilty" or the word "guilty," according to the decision you reach.

Because this is a criminal case, each of you must agree for you to return a verdict. When all of you have so agreed, fill in the verdict forms to express your decision. The presiding juror must sign the verdict forms and notify the bailiff. The bailiff will bring you into court to declare your verdict.

Because the jury question did not amount to a declaration of deadlock, the parties did not discuss "how long the court will require a deadlocked jury to continue deliberations before declaring a mistrial." Burdette, 178 Wn. App. at 201. As such, Wright's presence had no "relation, reasonably substantial," to his opportunity to defend against his charges. Lord, 123 Wn.2d at 306. The trial court did not violate Wright's constitutional right to be present at all critical stages of the proceedings.[11]

The rest of this opinion has no precedential value and should not be published in accordance with RCW 2.06.040.

---

[11] Wright also complains that the trial court's answer to the jury's question was error. He contends that the court should have also emphasized jury instruction 2, which explains jurors should not "surrender [their] honest belief about the value or significance of evidence solely because of the opinions of [their] fellow jurors" or "change [their] mind just for the purpose of reaching a verdict." We first note that the court referred the jury to their instructions as a whole. In any event, the adequacy of the court's response to the jury's question is a different inquiry altogether than the nature of the jurors' communication itself. And Wright does not claim instructional error on appeal. Instead, he argues that the violation of his right to be present is not harmless because the court's answer was unfair. Because we conclude that the court did not violate Wright's constitutional right to be present, we do not reach harmless error.

Severance

Wright contends the trial court erred by denying his motion to sever the counts related to J.B. from those involving N.F..[12]  We disagree.

"Severance" refers to "dividing joined offenses into separate charging documents."  State v. Bluford, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017).  "Severance may be ordered on a party's motion where 'the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense.' "  Bluford, 188 Wn.2d at 306 (quoting CrR 4.4(b)).  " 'Defendants seeking severance have the burden of demonstrating that a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy.' "  State v. Moses, 193 Wn. App. 341, 359-60, 372 P.3d 147 (2016) (quoting State v. Bythrow, 114 Wn.2d 713, 718, 790 P.2d 154 (1990)).

"Severance of charges is important when there is a risk that the jury will use the evidence of one crime to infer the defendant's guilt for another crime or

---

[12] Wright also argues that the trial court should have severed the N.F. and J.B. charges based on evidence and testimony that developed <u>after</u> the trial court denied his initial motion.  But as Wright acknowledges, defense counsel did not call the trial court's attention to any relevant change in circumstances when he renewed Wright's severance motion during jury selection.  And Wright did not renew his severance motion at or before the close of the evidence.  Wright cites State v. Jones, 93 Wn. App. 166, 172 n.8, 968 P.2d 888 (1998), for the proposition that on appeal, "all arguments for severance . . . supported by [the] record were 'subsumed within [defendant's] assertion at trial that severance should be granted because of the prejudice which would result from a joint trial.' "  Jones is distinguishable because the defendant moved to sever based on the evidence as it developed at trial.  Jones, 93 Wn. App. at 170.  Wright did not.  And Wright renewed his severance motion during jury selection in front of the trial judge who did not decide Wright's initial severance motion.  The trial court would have had no reason to know of any relevant evidentiary developments unless Wright specifically argued them.  We conclude Wright waived his argument that the trial court erred by not severing the charges based on the evidence as it developed at trial.  See CrR 4.4(a)(2) (severance is waived by failure to renew the motion before or at the close of all the evidence); RAP 2.5(a) (an argument not made below is waived on appeal).

to infer a general criminal disposition." State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

> In determining whether the potential for prejudice requires severance, a trial court must consider (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.

State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994). Additionally, "any residual prejudice must be weighed against the need for judicial economy." Russell, 125 Wn.2d at 63. "The failure of the trial court to sever counts is reversible only upon a showing that the court's decision was a manifest abuse of discretion." Bythrow, 114 Wn.2d at 717.

(1) Strength of State's Evidence on Each Count

Wright contends that the strength of the State's evidence on each count favored severance "because the case involving [J.B.] was much weaker than the case involving [N.F.]." The State counters that "the trial court reasonably found that the evidence in both cases was . . . independently strong." We agree with the State.

Wright asserts that "the single piece of evidence corroborating [J.B.]'s accusations" was the pair of Air Jordans officers photographed at the Skyway apartment "that detectives speculated might be women's shoes and might be the pair [J.B.] reported stolen." But Wright is incorrect. The trial court's ruling on

16

Wright's initial severance motion lists the corroborating evidence it relied on in detail:

> [T]he presence of the defendant's DNA on both N.F. and J.B.'s genitals after a sexual assault examination, photo[ ]montages shown to N.F. and J.B. where they each identified the defendant as their assailant, and a firearm recovered from the defendant's residence that matches the description of the firearm provided by N.F. and J.B. show, on balance, that the State's case is relatively strong as to [N.F.'s] Counts . . . and as to [J.B.'s] Counts.

The evidence in the J.B. counts was not weak enough to make it "necess[ary] for the jury to base its finding of guilt on . . . one count on the strength of the evidence on another count." State v. Smith, 74 Wn.2d 744, 755, 446 P.2d 571 (1968), vacated in part on other grounds, Smith v. Washington, 408 U.S. 934, 92 S. Ct. 2852, 33 L. Ed. 2d 747 (1972). The trial court did not abuse its discretion by concluding that consideration of the first factor did not favor severance.

### (2) Clarity of Defenses as to Each Count

The purpose of the second factor in the severance inquiry is to prevent "[t]he likelihood that joinder will cause a jury to be confused as to the accused's defenses." Russell, 125 Wn.2d at 64. This likelihood is "very small" when the defenses are identical on each charge. Russell, 125 Wn.2d at 64. Wright concedes that his defenses of "consent" to the rape charges and "general denial" as to the other charges "are consistent with one another." The trial court did not abuse its discretion when it determined this factor did not favor severance.

(3) Court's Instructions To Consider Each Count Separately

"The third factor to consider is whether the court properly instructed the jury to consider each count separately." Russell, 125 Wn.2d at 66. Here, in denying Wright's initial motion to sever, the trial court stated it would "instruct the jury that its verdict on one count should not affect its decision as to any other count charged." And the trial court properly instructed the jury, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." For these reasons, the trial court did not abuse its discretion by concluding that the third factor did not support severance.

Wright disagrees and contends the trial court's instruction was insufficient because the prosecutor improperly encouraged consideration of the counts together by "telling the jury that Mr. Wright carefully selected his victims and attacked them in 'almost the exact same' manner." Wright points out that in the context of alleged crimes sexual in nature, "there is a recognized danger of prejudice to the defendant even if the jury is properly instructed to consider the crimes separately." Sutherby, 165 Wn.2d at 884.

Sutherby involved joining counts of possession of child pornography with counts of child rape and molestation where it was "highly likely" that evidence of the child pornography charges and evidence of the other charges was not cross admissible because the images were not of the victim.[13] Sutherby, 165 Wn.2d at

---

[13] The Sutherby court considered cross admissibility in the context of determining whether the defendant's trial counsel was ineffective for failing to seek severance of the charges. Sutherby, 165 Wn.2d at 877.

886. The prosecutor capitalized on joinder by "consistently argu[ing] that the presence of child pornography on Sutherby's computers <u>proved</u> he sexually abused his granddaughter." <u>Sutherby</u>, 165 Wn.2d at 885.[14] The prosecutor also argued:

> "And how do you know that this man has a problem with sex with children and he fantasized about it and this was a present for him? You . . . saw a representative sample from the child pornography on that screen. <u>We know he is predisposed to touching children in a sexual manner</u>."

<u>Sutherby</u>, 165 Wn.2d at 885-86.[15]

Here, as discussed in the fourth factor below, evidence of the incident involving each victim was cross admissible as probative of a common scheme or plan. As a result, it was not improper for the prosecutor to suggest that similarities between the two incidents were probative of " 'a design (not a disposition) to rape.' " <u>State v. Lough</u>, 125 Wn.2d 847, 858-59, 889 P.2d 487 (1995) (quoting 2 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 357, at 335 (James H. Chadbourn rev. ed. 1979)). The prosecutor's argument here, which urged the jury to consider the evidence for a proper purpose, is distinguishable from <u>Sutherby</u>, where the prosecutor affirmatively argued the jury should consider the evidence for an improper purpose.[16] Wright fails to establish

---

[14] Emphasis added.

[15] Emphasis added.

[16] And an ER 404(b) limiting instruction would have mitigated any risk that the jury considered evidence of one incident as propensity evidence related to the other incident. The trial court invited the parties "to come up with a limiting instruction that you feel comfortable with," but there is no indication in the record that Wright proposed one. Nor does he cite persuasive authority that the trial court must give one. "A trial court is not required to sua sponte give a limiting instruction for ER 404(b) evidence, absent a request for such a limiting instruction." <u>State v. Russell</u>, 171 Wn.2d 118, 124, 249 P.3d 604 (2011).

that the trial court erred by not severing the charges based on the prosecutor's statements at trial.

(4) Cross Admissibility of Evidence

The fourth severance factor asks whether "evidence of each count would be cross admissible under ER 404(b) if severance were granted." Russell, 125 Wn.2d at 66. Wright argues the trial court "erroneously believed that random similarities" between the two incidents "were sufficient to show a 'common plan or scheme.' "

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." "The same evidence may, however, be admissible for any other purpose, depending on its relevance and the balancing of its probative value and danger of unfair prejudice."[17] State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). Relevant here, evidence of other misconduct is admissible to show a "common scheme or plan." Gresham, 173 Wn.2d at 421.

There are two categories of common scheme or plan evidence:

(1) "[W]here several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan" and (2) where "an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes."

Gresham, 173 Wn.2d at 421-22 (quoting Lough, 125 Wn.2d at 854-55). Evidence of the second type of common scheme or plan is admissible "because it is not an effort to prove the character of the defendant. Instead, it is offered to

---

[17] Wright does not argue that the trial court abused its discretion in its ER 403 balancing of the cross admissible evidence's probative value against its potential for prejudice.

show that the defendant has developed a plan and has again put that particular plan into action." Gresham, 173 Wn.2d at 422; cf. State v. York, 50 Wn. App. 446, 457, 749 P.2d 683 (1987) ("Demonstration of th[e] plan makes it more probable that the acts occurred as charged.").

This case involves only the second category. To introduce evidence of the second type of common scheme or plan, the prior misconduct and the charged crime "must demonstrate 'such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which' the two are simply 'individual manifestations.' " Gresham, 173 Wn.2d at 422 (quoting Lough, 125 Wn.2d at 860). Mere similarity in results is insufficient. Gresham, 173 Wn.2d at 422. Still, "while the prior act and charged crime must be markedly and substantially similar, the commonality need not be 'a unique method of committing the crime.' " Gresham, 173 Wn.2d at 422 (quoting State v. DeVincentis, 150 Wn.2d 11, 20-21, 74 P.3d 119 (2003)).

Here, the trial court found that "[b]ased on the State's offer o[f] proof, when analyzed together the two separate incidents were of such striking similarity as to warrant a finding of common scheme or plan on the part of the defendant." The court listed the similarities between the N.F. and J.B. incidents in its findings:

1. The defendant met both women through social media within days of meeting in-person
2. The defendant had casual conversations with both women prior to any sexual activity
3. The defendant requested vaginal sexual intercourse and both women refused such activity
4. The defendant's demeanor became violent prior to vaginal sexual intercourse
5. The defendant threatened physical violence prior to vaginal sexual intercourse

6. Defendant used physical violence or the threat thereof during vaginal sexual intercourse
7. Both women were engaged in commercial sexual activity
8. Both women were African-American females between 28 and 30 years old
9. Defendant used a condom during both incidents of vaginal sexual intercourse
10. Defendant disposed of condom in toilet after completing vaginal sexual intercourse
11. Defendant took property belonging to both women after completing vaginal sexual intercourse
12. Defendant threatened both women about reporting incident to anyone
13. Defendant took a photo of both women or their family prior to leaving
14. Defendant ceased contact and erased his social media presence after both incidents
15. Defendant utilized a firearm that was a silver handgun as described by both women.

Wright advances several arguments to support his assertion that these similarities were insufficient for cross admission as evidence of a common scheme or plan. But none of his arguments establishes that the trial court abused its discretion.

First, Wright argues that the first, second, eighth, ninth, and tenth similarities found by the trial court "are explainable as normal behavior in the age of online dating—they suggest only that Mr. Wright wanted to socialize and have protected sex with women of his same general age and race." Wright contends that these similarities are merely random and favored severance because "they do not indicate any criminal premeditation."

But the authority is to the contrary. See DeVincentis, 150 Wn.2d at 22 (similarities included defendant's getting to know young people through a safe channel and bringing them into his home); State v. Slocum, 183 Wn. App. 438,

455, 333 P.3d 541 (2014) (not abuse of discretion to admit evidence that defendant had, "in what would be perceived as grandfatherly behavior," invited both victims to sit with him in his recliner). The standard requires that the two incidents being compared have enough features in common to show "a general plan," not a criminally premeditated plan. DeVincentis, 150 Wn.2d at 21; see People v. Ewoldt, 7 Cal. 4th 380, 399, 867 P.2d 757 (1994) (rejecting the premise that "a common design or plan cannot be established by evidence reflecting that the defendant committed markedly similar acts of misconduct against similar victims under similar circumstances, unless all of these acts are part of a single, continuing conception or plot"), cited with approval in Lough, 125 Wn.2d at 855-56. We need not consider whether there is a plausible innocent explanation for each similarity.

Next, Wright challenges the trial court's third, fourth, fifth, sixth, and twelfth findings. Wright asserts that these similarities "describe essentially every vaginal rape, pre-planned or otherwise," and so they "tend to show only that Mr. Wright commits rape, not that he has developed a 'plan or scheme' for doing so." We reject the suggestion that every vaginal rape is similar.[18] Even so, our Supreme Court has rejected the proposition that similarities must be "unique" or "uncommon to the way the crime is typically committed" to support admission as

---

[18] A perpetrator's plan or scheme to commit sexual assault may vary depending on who the perpetrator chooses as a victim—a stranger, an acquaintance, an intimate partner, a family member, etc. And perpetrators use different forms of violence to commit sexual assault—use of force, threat of force, enticement, display of a weapon, or preying on those unable to consent. The suggestion that every vaginal rape is similar brushes aside these dynamics of sexual assault and presumes that every perpetrator of sexual violence exerts power and control over their victim in the same manner.

23

evidence of a common scheme or plan. DeVincentis, 150 Wn.2d at 18. The court held, "Although a unique method of committing the bad acts is a potential factor in determining similarity, uniqueness is not required." DeVincentis, 150 Wn.2d at 21.

The trial court did not err by considering similarities between the N.F. and J.B. incidents as evidence of a common scheme or plan, even if that plan was not elaborate or based on special expertise. As a result, the trial court did not abuse its discretion in determining that evidence of the two incidents was cross admissible under the fourth severance factor.

(5) Judicial Economy

The final consideration in the severance analysis requires the court to weigh any prejudice to the defendant resulting from joinder against the concerns for judicial economy. Russell, 125 Wn.2d at 63. Judicial economy is always a consideration, whether or not the State specifically argues it. See Bluford, 188 Wn.2d at 311 ("[I]f judicial economy is irrelevant, the justification for joinder disappears, and defendants would essentially be entitled to separate charging documents and trials on each alleged offense as a matter of right."). "Foremost among these concerns is the conservation of judicial resources and public funds." Bythrow, 114 Wn.2d at 723. "A single trial obviously only requires one courtroom and judge. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is significantly reduced when the offenses are tried together." Bythrow, 114 Wn.2d at 723. "Furthermore, the reduced delay on

the disposition of the criminal charges, in trial and through the appellate process, serves the public." Bythrow, 114 Wn.2d at 723.

Here, Wright fails to show that prejudice from joinder was likely under any of the other severance factors. And by bifurcating the trials on the two unlawful possession of firearm counts from the other counts, the trial court alleviated any potential prejudice from Wright's criminal history. The jury did not receive evidence of Wright's criminal history until after it considered the other charges. For these reasons, the trial court did not abuse its discretion by determining that considerations of judicial economy outweighed any prejudice from joinder.

We conclude that the trial court did not abuse its discretion by denying Wright's motion to sever.[19]

Ineffective Assistance of Counsel

Wright raises an ineffective assistance of counsel claim on the severance issue. He argues that counsel's performance was deficient because he made only a "perfunctory and procedural" renewal of Wright's motion to sever the J.B. counts from the N.F. counts with no new substantive argument and failed to renew the motion later. We disagree.

Ineffective assistance of counsel requires both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). But we need not "address both components of the inquiry if

---

[19] In a statement of additional grounds for review, Wright cites three additional cases for the proposition that the trial court erred by denying his severance motion. See United States v. Lewis, 787 F.2d 1318 (9th Cir. 1986); United States v. Ragghianti, 527 F.2d 586 (9th Cir. 1975); United States v. Bronco, 597 F.2d 1300 (9th Cir. 1979). These cases are not binding on this court, and we decline to consider them. See Cantu v. City of Seattle, 51 Wn. App. 95, 99, 752 P.2d 390 (1988); Home Ins. Co. of N.Y. v. N. Pac. Ry. Co., 18 Wn.2d 798, 808, 140 P.2d 507 (1943).

the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Strickland, 466 U.S. at 697. A defendant alleging ineffective assistance of counsel shows prejudice when there is a reasonable probability that but for counsel's error, the result of the trial would have been different. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

### (1) Strength of State's Evidence on Each Count

Wright contends the evidence at trial was much stronger on the N.F. charges because "some of [N.F.]'s testimony was corroborated by separate evidence," while "the case involving [J.B.] hinged entirely on her credibility." But testimony at trial later confirmed the corroborative evidence that the trial court relied on when considering Wright's initial severance motion. And despite Wright's attempt to impeach J.B., other evidence corroborated her testimony.

There is not a substantial likelihood that had his attorney renewed the motion, the trial court would have concluded the evidence was so disproportionate as to favor severance. See In re Pers. Restraint of Lui, 188 Wn.2d 522, 539, 397 P.3d 90 (2017) (In context of ineffective assistance, " '[t]he likelihood of a different result must be substantial, not just conceivable.' ")[20] (quoting Harrington v. Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)); cf. State v. MacDonald, 122 Wn. App. 804, 815, 95 P.3d 1248

---

[20] Alteration in original.

(2004) ("When one case is remarkably stronger than the other, severance is proper.").

(2) Cross Admissibility of Evidence

Wright contends that of the five similarities the court found "are properly regarded as probative of a common plan theory," all but one "were undermined or contradicted by the testimony at trial." He asserts, "In the end, the only remaining similarity between the two alleged offenses was that Mr. Wright may have taken property from both women." But Wright failed to establish the trial court abused its discretion by considering similarities that he argues were "features of either (1) virtually every vaginal rape or (2) typical dating or sexual behavior." And Wright is incorrect that testimony at trial undermined the remaining similarities to the point that the entire common plan or scheme analysis was no longer tenable.

The first of the court's challenged findings stated that both N.F. and J.B. "were engaged in commercial sexual activity." The testimony at trial supported this finding. J.B. admitted to working as an escort. While N.F. testified she was not advertising sexual services at the time, text messages admitted at trial showed Wright asked whether N.F. was still posting advertisements, saying, "I might have a move for you," and N.F. responded, "I'm not posted but I'm ready and available." N.F. also acknowledged on cross-examination that although she was no longer posting as an escort when she met Wright, some of her older advertisements remained on the Internet.

The testimony also supported the court's finding that Wright "utilized a firearm that was a silver handgun as described by both women." Wright points out that J.B. testified he merely displayed the gun to secure her cooperation, while N.F. testified Wright did not produce the gun until after the rape and then used it to strike her. But the relevant fact is that each woman described a silver gun that Wright used to secure her cooperation. Wright fails to explain how differences in the way he used the gun are material in the context of a common scheme or plan analysis, as opposed to a modus operandi analysis. See DeVincentis, 150 Wn.2d at 18 (explaining that modus operandi is used to prove identity, while a common scheme or plan is probative of whether the charged crime occurred).

Wright also challenges the similarity that he "took a photo of both women or their family prior to leaving." Wright asserts there was no testimony that he "took a photo of [N.F.] or her family." But the evidence showed that Wright had a photograph of N.F.'s Washington State identification card on his cell phone.

The final similarity that Wright claims supported a renewed motion to sever was the court's finding that he "ceased contact and erased his social media presence after both incidents." The State concedes that it did not present this evidence at trial. But we agree with the State that "this does not meaningfully detract from the other substantial similarities between the cases." We also agree with the State that taken together, the other similarities were probative of a common scheme or plan in Wright's selection of victims (women engaged in commercial sex work who might be less likely to report or be believed), his

method of meeting them in person by promising they could earn money, using a gun to secure compliance, and threatening them and their families if they said anything. For these reasons, even if Wright had renewed his severance motion at the close of the evidence, it is not reasonably probable the trial court would have granted severance. As a result, Wright cannot show prejudice, and his ineffective assistance of counsel claim fails.[21]

Confrontation

Wright contends the trial court violated his confrontation rights by excluding three categories of relevant impeachment testimony about J.B.'s Wells Fargo debit card, about whether she reported any income from City Live Barbershop on her tax return, and from the CVCP claims consultant. We disagree.

"Both the federal and state constitutions protect a defendant's right to confront an adverse witness." State v. Lee, 188 Wn.2d 473, 486, 396 P.3d 316 (2017); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "Confrontation" means "more than mere physical confrontation." Lee, 188 Wn.2d at 487 (citing Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)). " 'The main and essential purpose of confrontation is to secure for the opponent

---

[21] Wright argues that because one judge heard his pretrial severance motion and a different judge presided over the trial, "it was particularly unreasonable" for his attorney not to make "new substantive argument." He asserts that "the basis for [the pretrial judge]'s ruling denying severance had been substantially eroded [ ] by the close of the State's" case in chief. But as discussed above, based on the evidence at trial, Wright fails to show that the presiding trial judge "likely would have granted a renewed motion to sever."

the opportunity of cross-examination.' " Lee, 188 Wn.2d at 487[22] (quoting Davis, 415 U.S. at 315-16).

That said, "the right to confront a witness through cross-examination is not absolute." Lee, 188 Wn.2d at 487. " '[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Lee, 188 Wn.2d at 487[23] (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)). Accordingly, trial judges have wide latitude " 'to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " Lee, 188 Wn.2d at 487 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

We apply a three-part test to determine whether the trial court exceeded its discretion by limiting the scope of cross-examination:

> "First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld."

Lee, 188 Wn.2d at 488 (quoting State v. Darden, 145 Wn.2d 612, 622, 41 P.3d

---

[22] Internal quotation marks omitted.

[23] Alteration in original.

1189 (2002)). But we recognize that "[n]o state interest is sufficient to preclude highly probative evidence." Lee, 188 Wn.2d at 488.

#### (1) Wells Fargo Testimony

Wright sought to attack J.B.'s "character for being untruthful" through evidence that the Wells Fargo fraud department investigated her bank account and revoked her debit card. Wright contends the trial court erred by not allowing him to elicit testimony on cross-examination that J.B. "had a history [of] making false stolen-debit-card claims," the "exact same claim" she made against Wright. We disagree.

The Wells Fargo evidence was only minimally probative. The State did not charge Wright with robbing J.B., only N.F. And Wright did not offer the evidence to show bias or that J.B. had a motive to lie about whether Wright stole her wallet. See ER 404(b).[24] Instead, he offered it only for a collateral purpose— to invite the jury to infer that because J.B. lied about her debit card in the past, she also lied that Wright stole it. "Contradictory or impeaching testimony is collateral if it could not be shown in evidence for any purpose independent of contradiction." State v. Alexander, 52 Wn. App. 897, 901-02, 765 P.2d 321 (1988). And Wright points to no evidence suggesting that J.B. believed she would gain any benefit from reporting that Wright stole her debit card. As the

---

[24] ER 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

State points out, a detective later testified that J.B. denied any fraudulent or suspicious activity on her cards after Wright stole them.

In contrast to the low probative value of the evidence, the potential for prejudice was high. Admitting the evidence solely to show J.B.'s "character for being untruthful" would invite the jury to infer improperly that she had a propensity to lie. This is exactly the kind of inference our evidence rules are designed to prevent—"specifically because of its potentially prejudicial effect." Lee, 188 Wn.2d at 494 (citing ER 404(b)).

Moreover, Wright could still attack J.B.'s credibility. Defense counsel elicited testimony that several days elapsed before J.B. told the detective that she "just realized" Wright stole a small black pouch containing her debit card. But J.B. also testified that during a defense interview, she told counsel that she saw Wright take her wallet on the day of the incident.

Because the Wells Fargo evidence had minimal probative value and Wright had a chance to impeach J.B. through other testimony, the State's interests in excluding the prejudicial evidence outweighed Wright's need for it.

(2) Income Reporting Testimony

Wright next contends the trial court violated his confrontation rights by barring him from asking J.B. whether she reported any income from City Live Barbershop on her federal tax return. He claimed that the evidence was "relevant and material to the Defense that Ms. J.B. is not a credible person." We disagree.

As with the evidence on J.B.'s Wells Fargo debit card, this evidence was of minimal probative value. The uncontroverted evidence that J.B. received $15,000 in CVCP funds for income from a job that she did not have already established her bias or motive to fabricate. Whether she reported the fabricated income to the IRS was a collateral matter. And Wright had a full opportunity to attack J.B.'s credibility about her income because the trial court allowed Wright to call Wimberly, the barbershop owner, who testified that J.B. did not work at the barbershop.[25]

The prejudicial nature of the evidence inviting the jury to infer improperly that J.B. had the propensity to lie outweighed its minimal probative value.

(3) CVCP Claims Consultant Testimony

Finally, Wright contends the trial court violated his confrontation rights by precluding him from calling the CVCP claims consultant, "who would have testified for the defense about her office's process for vetting claims." But Wright fails to explain how barring the consultant's testimony implicates his right to confront J.B.

While barring a defense witness' testimony may implicate Wright's right to compulsory process or his due process right to present a defense, Wright does not argue that the trial court violated those rights. See State v. Hudlow, 99

---

[25] J.B. testified that Markell Patton was her supervisor at the barbershop. On appeal, Wright points out that when Wimberly took the stand, she admitted on cross-examination that she did not know how much money Patton earned as an independent contractor and so "did not know how much money [Patton] might have paid a receptionist." But Wimberly's testimony was still of meaningful impeachment value given that J.B. testified she was a "receptionist" at City Live Barbershop and that her supervisor was the "manager, Markell Patton"; whereas Wimberly testified that the barbershop did not employ any receptionists, that J.B. never worked for her in any capacity, and that Patton was a barber who merely rented a chair weekly.

Wn.2d 1, 14-15, 659 P.2d 514 (1983) (The Sixth Amendment and article I, § 22 "grant criminal defendants two separate rights: (1) the right to present testimony in one's defense, and (2) the right to confront and cross-examine adverse witnesses.");[26] United States v. Jinwright, 683 F.3d 471, 482-83 (4th Cir. 2012) ("A defendant's Fifth Amendment [to the United States Constitution] right to due process guarantees 'the right to a fair opportunity to defend against the State's accusations,' which, under the Sixth Amendment, includes the 'rights to confront and cross-examine witnesses and to call witnesses in one's own behalf.' ")[27] (quoting Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)).  Wright does not show that precluding testimony from the CVCP claims consultant implicates his confrontation rights.[28]

Prosecutorial Misconduct

Wright argues the prosecutor committed reversible misconduct during closing argument by improperly vouching for J.B., arguing adverse inferences from Wright's right not to testify, and abandoning its common scheme or plan theory.  We disagree.

Prosecutorial misconduct may deprive a defendant of his guarantee to a fair trial under the Sixth and Fourteenth Amendments and article I, section 22.  In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012).

---

[26] (Emphasis added.)  We have observed that "[c]ourts and litigants often refer to these rights, collectively, as the 'right to present a defense,' although this phrase does not appear in our state or federal constitutions."  State v. Bedada, 13 Wn. App. 2d 185, 193 n.2, 463 P.3d 125 (2020).

[27] Emphasis added.

[28] As with the debit card and income reporting testimony, even if Wright's confrontation rights were at issue, the CVCP claims consultant's testimony would go to only a collateral matter—whether J.B. made misrepresentations on her CVCP application.

To prevail on a claim of prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011); State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). "We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions." State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

If the defendant establishes that a prosecutor's statements are improper, "we determine whether the defendant was prejudiced under one of two standards of review." State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected at trial, he "must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760. If the defendant did not object at trial, he "is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61.

(1) Improper Vouching

Wright asserts the prosecutor improperly told the jury that J.B. "falsified her CVC[P] claim only to hide her history of sex work," that "her decision to testify was brave because she might face prosecution for the falsified claim," and that "if she had fabricated the allegations against Mr. Wright she would not have testified" because CVCP "did not require it." Wright argues no testimony

35

supported any of these claims, but "they painted a sympathetic picture of a woman, struggling to support her family, who would seek justice at great personal risk."

Although it is improper for a prosecutor to vouch for a witness' credibility, "a prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). "Thus, closing argument does not constitute improper vouching unless it is clear that the prosecutor is not arguing an inference from the evidence, but instead is expressing a personal opinion about credibility." Lewis, 156 Wn. App. at 240.

Wright asserts several specific examples of improper vouching. First, after conceding that J.B. lied on her CVCP application, the prosecutor asked the jury:

> Could it have been, because she didn't want to list prostitute as the nature of her employment. Was it easier to put down receptionist? Was it an opportunity for money for her family, an opportunity that literally [m]ailed itself to her door, five months after she was raped?

Second, the prosecutor argued:

> Despite obtaining that money from [CVCP], [J.B.] still walked into this courtroom. She not only testified about what this man did to her, but she also answered the questions about her participation in that document, and she did so freely. She told you full well, she doesn't have [an] immunity agreement. She came to this courtroom knowing full well, she herself may have to see a courtroom just like this, because of what she did.

And third, the prosecutor argued, "Heck, think about it to[o] — if all [J.B.] wanted was that [CVCP] money, why the heck did she show up here? You

36

heard she was paid out in January, so why show up?  That program literally didn't require that she testify."

None of these arguments rose to the level of the prosecutor expressing an opinion about J.B.'s credibility.  Rather, the prosecutor, who was on notice that defense counsel intended to use J.B.'s false CVCP claim to impeach her credibility, properly used his closing argument to engage in anticipatory witness rehabilitation.

And with one exception, each of the prosecutor's arguments constituted a reasonable inference from the evidence.  J.B. testified that she was a single mother and that she did not want to work as an escort, but did so because she was "behind on bills" and "just got kind of desperate."  She testified later that she originally did not tell officers the truth about how she met Wright because she "was embarrassed and ashamed" and did not want the police to judge her for inviting someone she did not know into her home.  And J.B. testified that the prosecutor "never" offered her immunity in exchange for her testimony.  Furthermore, Wimberly testified that she never employed J.B. in any capacity.  Based on this testimony, it was not improper for the prosecutor to concede that J.B. lied on her CVCP application but argue a reasonable inference that she did so because she saw CVCP as a chance to support her family without disclosing her actual occupation.

It also was not improper for the prosecutor to argue the reasonable inference that J.B. risked the consequences of lying by testifying without immunity.  This is particularly so given the context in which the prosecutor made

his argument—while discussing the instruction that the jury could consider "any personal interest that the witness might have in the outcome or the issues" when considering a witness' testimony. The prosecutor made reasonable inferences in arguing that testifying went against J.B.'s personal interests. This was not misconduct.

That said, the prosecutor improperly argued a fact not in evidence when he stated that CVCP did not require J.B. to testify. There was no testimony in this regard. But we conclude that given the prosecutor's argument as a whole, this isolated statement did not have a substantial likelihood of affecting the jury's verdict.

### (2) Arguing Adverse Inferences from Exercising Right Not To Testify

Wright contends the prosecutor committed misconduct when he "told the jury that Mr. Wright's not-guilty plea was a 'lie[ ].' "[29] He asserts that after acknowledging J.B. falsified her CVCP application, "the prosecutor contrasted that lie with Mr. Wright's not-guilty plea, arguing that the plea was more dishonest." "A prosecutor violates a defendant's Fifth Amendment rights if the prosecutor makes a statement 'of such character that the jury would naturally and necessarily accept it as a comment on the defendant's failure to testify.' " State v. Fiallo-Lopez, 78 Wn. App. 717, 728, 899 P.2d 1294 (1995)[30] (quoting State v. Ramirez, 49 Wn. App. 332, 336, 742 P.2d 726 (1987)).

---

[29] Alteration in original.

[30] Internal quotation marks omitted.

According to Wright, the prosecutor urged the jury to make an adverse inference from Wright's exercise of his constitutional right not to testify. He points to the following argument from the prosecutor:

> It's not the same folks, because what [J.B.] lied about, compare that to what he lied. [J.B.] lied about where she was working, and how much she got paid to a program. Not to a detective, not to you and the court, she — but what he lied about was essential to this case.

We reject Wright's contention because it takes the prosecutor's argument out of context. The prosecutor made his argument while discussing Wright's recorded statement to a detective first about N.F., then about both victims, which the trial court admitted into evidence. The prosecutor argued:

> [Wright's] statement [to the detective] is dripping with self-serving statements. It actually starts out with a flat lie. I wasn't with a female on Father's Day, I was with my family. Then of course, he has to back pedal a little bit, well I didn't know it was someone I paid her for sex. I talked about getting a job for [N.F.]. I certainly didn't hurt her. I didn't pistol whip her, cause if I were to pistol whip her, she wouldn't [have] been able to walk away.
>
> Then of course he lies, I don't mess with guns. And, of course . . . the gun [is] recovered in his house, matching the description given by these two women before they found the gun[.] . . .
> . . . .
> Tedgy Wright's statement [to the detective] is one that should not be credible for multiple reasons, personal interests is just one. But, maybe you're still saying, but you had lied, isn't that [the] same, a lie is a lie, is a lie? It's not the same folks, because what [J.B.] lied about, compare that to what he lied. [J.B.] lied about where she was working, and how much she got paid to a program. Not to a detective, not to you and the court, she — but what he lied about was essential to this case. Did you have a gun? . . . Did you . . . rape [N.F.]? Did you assault her? Did you rob her?

In short, the prosecutor argued, based on Wright's admitted statement, that some of the things he said to the detective were not true. The prosecutor did not suggest that Wright's plea of not guilty was a lie, and Wright fails to explain

how the jury would " 'naturally and necessarily' " accept anything in the prosecutor's argument as a comment on Wright's decision not to testify. Fiallo-Lopez, 78 Wn. App. at 728[31] (quoting Ramirez, 49 Wn. App. at 336). Wright fails to establish that the prosecutor's argument constituted misconduct.

(3) Abandoned Common Plan or Scheme Theory

Wright contends the prosecutor committed misconduct "when he suddenly abandoned the State's 'common plan or scheme' theory and argued that Mr. Wright 'snap[ped].' "[32] He points to the following argument from the prosecutor, who was discussing the elements the jury must consider for the rape charges:

> One of the elements that's not on here, and the State did not have to prove to you beyond a reasonable doubt, is when he met up with both women, was he trying to rape them? Did he go in knowing that he was going to rob them, unclear? The evidence doesn't show that answer beyond a reasonable doubt, that the State doesn't have to prove that. Maybe he really did just get frustrated, when a [prostitute] was saying no to him. Maybe that's what made him snap. Because the only questions you need to answer, the only questions the State is required to prove to you beyond a reasonable doubt are those elements we just went over.

Wright contends the prosecutor's argument constituted "an invitation to convict Mr. Wright because he is the kind of person who rapes, robs, and assaults." He asks us to equate the prosecutor's argument with "deliberately violating a pre-trial ruling in limine." But Wright does not point to any ruling in limine that the prosecutor's closing statement violated.

Wright also argues the prosecutor's argument "was particularly prejudicial in light of the jury instructions, none of which limited the cumulation of evidence

---

[31] Internal quotation marks omitted.

[32] Alteration in original.

to the issue of a common plan." But he cites no authority for the proposition that the prosecutor must tailor his argument around a limiting instruction that was not proposed or given.

Furthermore, the jury instructions directed the jury to consider "each count separately." They also directed the jury that it could convict only if it found each element of each crime satisfied beyond a reasonable doubt. To this end, the prosecutor made his argument just after he walked the jury through the to-convict instructions for the charged crimes. The prosecutor then correctly pointed out that none of the to-convict instructions required the State to prove why Wright raped each woman or whether he planned to do so when he first met them. The jury could consider similarities between the two incidents as probative to whether each crime was an individual manifestation of a common scheme or plan, but the prosecutor properly argued that a common scheme or plan was not an element of either crime.

For these reasons, we reject Wright's argument that the prosecutor's closing statement constituted misconduct.

Booking Photographs

Wright contends the trial court erred by admitting two photomontages that contained his booking photograph. Wright does not argue that the photomontages were not relevant. See ER 402. Instead, he asserts his portrayal in jail clothes constituted evidence of a prior crime or conviction, was inherently prejudicial, and outweighed the minimal probative value of the photos. We disagree.

41

The court may exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. "A trial judge has wide discretion in balancing the probative value of evidence against its potentially prejudicial impact." State v. Rivers, 129 Wn.2d 697, 710, 921 P.2d 495 (1996).

Wright relies on Rivers to support his assertions. In that case, our Supreme Court held that admission of a booking photograph was not unduly prejudicial. Rivers, 129 Wn.2d at 711-12. The court held:

> Because Defendant Rivers raised the issue of identity during opening statements, the photograph of the Defendant on the day of the crime was relevant as it tended to show that the victim's description to police matched the man arrested shortly after the robbery. The admission of the photo was not prejudicial because the jury knew the Defendant was arrested for the crime on which he was being tried, and the jury would reasonably have been aware that a booking procedure, including photographing the Defendant, would have existed.

Rivers, 129 Wn.2d at 712.

In contrast to Rivers, Wright claims his "[i]dentity was not in dispute, since Mr. Wright admitted to sexual contact with both accusers and argued only that it was consensual." But his citation to the record to support that assertion contains no such admission. And the parties did not stipulate as to identity. The State bore the burden to prove identity beyond a reasonable doubt. Because Wright denied guilt, the State had the right to present "ample evidence" proving identity. State v. Rahier, 37 Wn. App. 571, 574, 681 P.2d 1299 (1984).

Additionally, "[a] booking photograph is not necessarily prejudicial." State v. McCreven, 170 Wn. App. 444, 485, 284 P.3d 793 (2012). Here, the photomontages showed only each pictured person's head and upper shoulders. Although it is apparent in one photomontage that each person is wearing the same orange shirt,[33] the pictures used did not bear other identifiable aspects of "mug shots" that would likely invite an inference of a past arrest. See State v. Tate, 74 Wn.2d 261, 267, 444 P.2d 150 (1968) (admission of mug shot not unfairly prejudicial where the prosecutor removed identifying numbers from the photos and never used the words "mug shot" in the presence of the jury). Nor does Wright argue that any witness testified that the photomontages were assembled using booking photographs. Under these circumstances, we cannot say the trial court abused its discretion by admitting the photomontages.

Cumulative Error

Wright argues that he is entitled to a new trial under the cumulative error doctrine. Application of the cumulative error doctrine "is limited to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Here, the only error was the prosecutor's isolated statement that CVCP did not require J.B. to testify, and we concluded that statement did not have a substantial likelihood of affecting the jury's verdict. As a result, the cumulative error doctrine does not apply.

---

[33] The other photomontage was black and white.

We affirm Wright's convictions.

_____ Brennan, J

I CONCUR:

_____ Chun, J.

COBURN, J. (concurring in part and dissenting in part) — I respectfully dissent because the majority's decision today effectively establishes a higher threshold defendants must meet to trigger the right to presence at trial than what the constitution demands. Wright was denied his constitutional right to be present during a critical stage. Thus, I would hold that reversal is required because the State fails to show that Wright's absence was harmless beyond a reasonable doubt. I concur with the majority's resolution of the remaining issues.

After having the opportunity to deliberate for multiple days, the jury inquired, "If we are unable to reach a verdict on a count, what happens?" The majority holds that this inquiry did not implicate Wright's right to be present while the court considered its response because the jury did not declare it was, in fact, deadlocked. While a communication indicating a jury deadlock is certainly *sufficient* to trigger a defendant's right to be present, it is not *necessary*.

Wright contends the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution by consulting with counsel about the jury inquiry while Wright was absent. Wright does not separately analyze his federal and state constitutional claims. But I am nonetheless obliged to examine those claims separately "because [our Supreme Court] has previously interpreted the right to 'appear and defend' [under our State constitution] independently of federal due process jurisprudence.' " State v. Irby, 170 Wn.2d 874, 885, 246 P.3d 796 (2011). I begin my analysis with Wright's federal constitutional claim.

"Under the Sixth and Fourteenth Amendments [to the United States

1

Constitution], a criminal defendant has the right to attend all critical stages of his trial." State v. Pruitt, 145 Wn. App. 784, 798, 187 P.3d 326 (2008). A "critical stage" is a stage " 'for which [the defendant's] presence has a relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge.' " Pruitt, 145 Wn. App. at 798 (internal quotation marks omitted, second alteration in original) (quoting State v. Rice, 110 Wn.2d 577, 616, 757 P.2d 889 (1988)). The right extends even to those situations when the defendant is not actually confronting witnesses or evidence against him. Pruitt, 145 Wn. App. at 798.

The right to be present is not unlimited. For example, the defendant has no right to be present " 'when presence would be useless, or the benefit but a shadow.' " Pruitt, 145 Wn. App. at 798 (quoting Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)). "But an accused 'is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.' " Pruitt, 145 Wn. App. at 798 (quoting Stincer, 482 U.S. at 745). Indeed, " '[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence.' " Pruitt, 145 Wn. App. at 798 (internal quotation marks omitted) (quoting State v. Wilson, 141 Wn. App. 597, 604, 171 P.3d 501 (2007)).

In State v. Burdette, we considered whether a conference about a jury inquiry was a critical stage implicating the defendant's right to be present under the federal constitution. There, less than an hour after the court provided the jury

with a corrected instruction as to one of the charges, the jury submitted a communication stating, " 'Jury is deadlocked over several issues relating to the defendant's intent.' " 178 Wn. App. 183, 195-96, 313 P.3d 1235 (2013). On appeal, we recognized that despite the inquiry's use of the term "deadlocked," the jury's communication "was not that it was hopelessly deadlocked on the case or any of its aspects, but rather was its first communication that it was having trouble agreeing." Burdette, 178 Wn. App. at 197. We also recognized the jury's communication "was not a direct request for clarification of the jury instructions, but rather appears to be a request *for instructions about how to proceed when the jury feels it is deadlocked on a specific issue*." Burdette, 178 Wn. App. at 195 (emphasis added). The court thus distinguished the jury communication from one involving "only a purely legal question" and held the trial court violated the defendant's right to be present by consulting with counsel about the jury communication in the defendant's absence. Burdette, 178 Wn. App. at 200; cf. State v. Sublett, 156 Wn. App. 160, 183, 231 P.3d 231 (2010) (holding that in-chambers conference involving "only the purely legal issue of how to respond to the jury's request for a clarification in one of the trial court's instructions" was not a critical stage of trial), aff'd on other grounds, 176 Wn.2d 58 (2012). The Burdette court explained,

> [T]he essence of the . . . jury communication was an inquiry as to how the jury should proceed when it felt deadlocked on the defendant's intent. *To a defendant, all may pivot on how long the court will require a deadlocked jury to continue deliberations before declaring a mistrial. In some situations, a defendant may desire a quick mistrial and in others more deliberations in hope of an acquittal. Whatever the case, much is at stake at this stage and a defendant may reasonably wish to actively participate by making*

3

*his opinion known to his lawyer or, if allowed, to the judge.* For these reasons, the defendant's presence at this stage has a direct relation to the fullness of his opportunity to defendant against the charge. Therefore, . . . [the defendant] had a right under the . . . federal constitution[ ] to be present when the response to the . . . communication from the jury was discussed.

Burdette, 178 Wn. App. at 201 (emphasis added).

Here, as in Burdette, the jury indicated that it was having trouble agreeing even though it did not use the term "deadlock." Cf. State v. Smith, 320 N.C. 404, 422, 358 S.E.2d 329 (1987) (observing, with regard to jury's inquiry about what would happen if its decision was not unanimous, "The jury here obviously was not unanimous when it posed the question; otherwise, it would not have inquired as to the effect of its failure to attain unanimity."). Furthermore, the jury submitted its inquiry more than four and a half days after it received the case and after one and a half days of active deliberation.[1] The jury was not just inquiring out of procedural curiosity. Thus, like the jury inquiry in Burdette, the inquiry here was not a purely legal inquiry but rather "a request for instructions about how to proceed" when the jury feels it cannot come to an agreement. Burdette, 178 Wn. App. at 195. And as the Burdette court observed, "much is at stake at this stage" in terms of the defendant's opportunity to weigh in on the matter. 178 Wn. App. at 201. Particularly relevant here is the determination of what, if any, jury instructions should be emphasized in response to the inquiry. 178 Wn. App. at 201.

---

[1] The jury commenced deliberations the afternoon of Thursday, April 11, 2019. The record suggests the jury did not deliberate on Friday, April 12. However, the record reflects the jury was in deliberations the following Monday. The jury inquiry was dated Tuesday, April 16, 2019, at 11:06 a.m.

4

The majority concludes that the stakes are only high enough to trigger the right to presence if the jury actually indicates it is deadlocked. But the stakes are equally high when the jury indicates it is having trouble agreeing. This is because, just as is the case when the jury indicates a deadlock, the court's response could have the effect of either nudging the jury toward a verdict or increasing the chances of a mistrial. The majority's requirement that the jury use magic language to affirmatively indicate its disagreement—even when it is clear from the context the jury is having trouble agreeing—effectively sets a higher threshold to trigger the defendant's right to presence than what the constitution demands, i.e., that the defendant's presence have a reasonably substantial relation to the fullness of his opportunity to defend.

Because the jury's inquiry was not an inquiry involving only a purely legal question, the fact that Wright's attorney was present is irrelevant.[2] Just as in jury selection, where the defendant's right to be present is well recognized, a defendant may, despite being a non-lawyer, actively contribute to a conference about a jury's inability to agree by providing input to his counsel. See State v. Bennett, 168 Wn. App. 197, 203, 274 P.2d 1224 (2012) (recognizing that the defendant's right to be present encompasses jury selection where the defendant may actively contribute to his own defense by offering input to counsel). Indeed, it is not difficult to imagine that had Wright been present for the discussion in this

---

[2] Perhaps recognizing this, the Federal Rules of Criminal Procedure, which require the defendant's presence at every trial stage, make an exception for conferences on *legal questions*, but not for conferences on *non-legal questions.* Fed. R. Crim. P. 43(a), (b)(3).

5

case, he would have discussed the jury's inquiry with his attorney and could have advocated for a mistrial or at least questioned why the court was elevating some instructions over others.

For the foregoing reasons, I would hold that the conference regarding the jury's inquiry was a critical stage of trial, and the trial court violated Wright's federal constitutional right to be present by consulting with counsel in Wright's absence.

I would also hold that the court violated Wright's state constitutional right to be present. "Unlike the United States Constitution, article I, section 22 of the Washington Constitution provides an explicit guaranty of the right to be present: 'In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel.'" Irby, 170 Wn.2d at 884-85 (quoting CONST. art. 1, § 22). Our Supreme Court has long recognized that this right applies "at every stage of the trial when [the defendant's] substantial rights may be affected." State v. Shutzler, 82 Wash. 365, 367, 144 P. 284 (1914), overruled on other grounds. In other words, the right to be present under our state constitution does not turn on what the defendant could contribute by his presence but on the effect of the proceeding on the defendant's substantial rights.

Here, the conference at which the court and counsel discussed the jury's inquiry was one at which Wright's substantial rights could be affected because, as discussed, the response to the inquiry could have the effect of either nudging the jury toward a verdict or increasing the chances of a mistrial. Accordingly, Wright was entitled to be present during that conference, and the trial court

6

violated Wright's right to presence under article I, section 22 by conducting it in his absence.

Because I would hold the trial court erred by violating Wright's right to be present, I next consider whether that error was harmless. See Burdette, 178 Wn. App. at 201 ("A violation of the right to be present at trial, whether anchored in due process or article I, section 22 of our state constitution, is subject to harmless error analysis."). " '[T]he burden of proving harmlessness is on the State and it must do so beyond a reasonable doubt.' " Irby, 170 Wn.2d at 886.

The State points out that even though the Burdette court found a violation of the defendant's right to be present, it ultimately concluded the error was harmless because "the facts show it very unlikely that [the defendant]'s absence had any effect on the judge's response to the . . . jury communication." 178 Wn. App. at 201-02. The State argues that "[t]he same is true here."

I disagree. In Burdette, we concluded the defendant's absence was unlikely to have had any effect because (1) the jury's inquiry "could have come only after short deliberations," so the judge's response directing the jury to continue deliberating seemed "nearly inevitable" and (2) the defendant did not argue "what he would have said or done had he been present when the . . . jury communication was discussed." 178 Wn. App. at 202. Here, by contrast, the jury had been deliberating for more than a day and a half. Accordingly, this is not a case where it was "nearly inevitable" that the court would respond in a particular way to the jury's communication indicating it was having trouble agreeing as to "a count."

7

Furthermore, I agree with Wright that the trial court's response to the jury likely had the effect of emphasizing the need for a verdict. Specifically, the court's response did not, as the State asserts, merely direct the jury to refer to its instructions. Rather, the trial court responded, "See your instructions, *particularly instructions #10 and #28*." (Emphasis added.) Instruction 10 stated, "A separate crime is charged in each count. You *must decide* each count separately. Your verdict on one count should not control your verdict on any other count." (Emphasis added.) Instruction 28 concluded by stating:

> *You must fill in the blank provided in each verdict form the words "not guilty" or the word "guilty," according to the decision you reach.*
> *Because this is a criminal case, each of you must agree for you to return a verdict. When all of you have so agreed, fill in the verdict forms to express your decision. The presiding juror must sign the verdict forms and notify the bailiff. The bailiff will bring you into court to declare your verdict.*

(Emphasis added.)

As Wright correctly points out, both of these instructions presume the jury *will* reach a verdict. By emphasizing these instructions, the trial court deemphasized other instructions, including Instruction 2, which directed the jurors: "You should not . . . surrender your honest belief about the value or significance of evidence solely because of the opinions of your fellow jurors. *Nor should you change your mind just for the purpose of reaching a verdict.*" (Emphasis added.) In other words, even assuming a neutral response would have constituted harmless error, the court's response here was not neutral. Cf. Jasper, 158 Wn. App. at 543 (holding that the court's error in responding to jury inquiry without consulting counsel was harmless because "[t]he trial court's

response was neutral, did not convey any affirmative information, and did not communicate to the jury any information that was harmful to" the defendant); State v. Langdon, 42 Wn. App. 715, 717-18, 713 P.2d 120 (1986) (a court's instruction is neutral when it "simply refer[s] the jury back to the previous instructions"). Instead, the trial court emphasized instructions that could have had the effect of nudging the jury toward a verdict.[3] The jury returned guilty verdicts less than two and a half hours after receiving the trial court's response, including, presumably, the lunch hour.[4]

The State asserts that "Wright does not explain how any input from him would have likely changed the proposed response." But under a constitutional harmless error standard, it is the State's burden to show that Wright's input would *not* likely have changed the outcome and not the other way around.[5] Furthermore, if Wright had been present, he likely would have, in discussing the jury's inquiry with his attorney, asked what could be done to try to ensure that jurors leaning toward acquittal would not give in to pressure from other jurors so

---

[3] In State v. Besabe, we held that, even assuming the trial court failed to consult counsel before answering a jury inquiry about a potential contradiction between two instructions, that error was harmless where the court responded, " 'Please *follow all* of the instructions, *including* instruction 30.' " 166 Wn. App. 872, 882-83, 271 P.3d 387 (2012) (emphasis added). But a response directing the jury to "follow all" instructions, "including*"* certain instructions, is distinguishable from a response directing the jury to "[s]ee your instructions, *particularly* instructions #10 and #28." (Emphasis added.) .

[4] The trial court responded to the jury at 11:37 a.m. on April 16, 2019, and the jury was summoned to the courtroom at 2:06 p.m. that same day to read its verdict.

[5] The State does not argue that there was overwhelming untainted evidence of Wright's guilt. See State v. Barry, 183 Wn.2d 297, 303, 352 P.3d 161 (2015) (constitutional harmless error standard "can be met if there is overwhelming evidence of the defendant's guilt that is not tainted by the error").

as to increase the likelihood of a mistrial. This discussion would naturally have prompted defense counsel to request that Instruction 2 be included in the court's response to the jury, or at the very least, that the response simply refer to *all* of the instructions without emphasizing any particular ones.

Finally, the State, which merely asserts incorrectly that "the trial court responded, as trial courts usually do, that the jury should refer to its instructions," fails to persuade me that had the court's response been different, the jury would nonetheless have reached a verdict beyond a reasonable doubt. Cf. State v. A.M., 194 Wn.2d 33, 41, 448 P.3d 35 (2019) ("A constitutional error is harmless if 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (internal quotation marks omitted) (quoting State v. Brown, 147 Wn.2d 330, 341, 58 P.3d 889 (2002))). Put another way, I cannot assume, as the State appears to, that had Wright been present, "nothing would have changed—not defense counsel's arguments, the court's response, or the outcome in this . . . case." See Roberts v. United States, 213 A.3d 593, 598 (D.C. Ct. App. 2019) (rejecting the government's argument that constitutional error was harmless because there was no evidence that defense counsel's arguments would have changed had the error not occurred). Thus, the State fails to establish that the trial court's error was harmless. Cf. Smith, 320 N.C. at 422 (reversing where the court responded to the jury's inquiry about what would happen if it was unable to reach a unanimous verdict "by reiterating the need for the jurors to confer together without violating individual judgments and again informing the jury that its decision must be unanimous," explaining that this

10

response, in the context of the jury's inquiry, "probably resulted in coerced unanimity" and "probably conveyed the erroneous impression that a unanimous decision . . . was required").

I would hold that the trial court violated Wright's right to be present under both the federal and state constitutions by consulting with counsel about the jury inquiry in Wright's absence, and the State does not meet its burden to establish that the error was not harmless beyond a reasonable doubt. I would reverse on this basis, and thus, I respectfully dissent.

_____
Coburn, J.